**SMITH CORONA CORPORATION**

v.

**PELIKAN, INC.**

No. 3–90–0479.

United States District Court, M.D. Tennessee, Nashville Division.

Jan. 9, 1992.

454

For the reasons stated below, the Court denies Pelikan's motion for JNOV/new trial, and assesses damages.

William W. Gibson, J. Graham Matherne, Wyatt, Tarrant, Combs, Gilbert & Milom, Nashville, Tenn., R. Mark Halligan, Daniel R. Cherry and Gerald S. Schur, Welsh & Katz, Ltd., Chicago, Ill., for plaintiff.

Charles W. McElroy, Casey F. Wilson, Nashville, Tenn., Cynthia E. Kernick, Thomas C. Wettach, Kerry A. Kearney, Pittsburgh, Pa., for defendant.

## MEMORANDUM

HIGGINS, District Judge.

Pursuant to Rules 50(b) and 59(a), Fed. R.Civ.P., the Court has before it the motion of defendant Pelikan, Inc., for judgment notwithstanding the verdict or, in the alternative, a new trial (filed April 8, 1991; Docket Entry No. 246), and an accompanying memorandum in support thereof (filed April 8, 1991; Docket Entry No. 247). On May 1, 1991, Smith Corona Corporation filed a memorandum in opposition to Pelikan's motion (Docket Entry No. 260). Thereafter, Pelikan submitted a reply memorandum (filed May 15, 1991; Docket Entry No. 270).

In addition, the Court has before it Smith Corona's motion for increased damages and prejudgment interest (filed March 25, 1991; Docket Entry No. 242); Smith Corona's motion for interim damages (filed March 25, 1991; Docket Entry No. 240); Smith Corona's motion for post-trial discovery regarding damages (filed March 25, 1991; Docket Entry No. 239); Smith Corona's motion for post-trial discovery regarding Pelikan's changed products and packaging (filed April 24, 1991; Docket Entry No. 254); Pelikan's motion to clarify injunction (filed March 29, 1991; Docket Entry No. 245); and Pelikan's motion to continue stay of injunction (filed May 29, 1991; Docket Entry No. 274).

## I. FACTS.

This is a civil action in which Smith Corona sued Pelikan for injunctive relief and damages for infringement of one utility patent (No. 4,900,171) and two design patents (Nos. Des. 308,070 and Des. 310,384) in violation of the patent laws of the United States, 35 U.S.C. §§ 1, *et seq.*, and for unfair competition and false or deceptive advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47–18–101, *et seq.*

Proof at trial revealed the following facts.

Smith Corona is a manufacturer of typewriters and typewriter ribbons for use in the equipment it markets. Smith Corona also makes and markets correction tapes, in spools and cassettes, used to correct the mistakes made by the typewriter during its use. Pelikan manufactures typewriter ribbons and correction tapes for use in equipment manufactured by others, including Smith Corona. Generally, these ribbons and correction tapes are sold as replacements for the supplies sold by the original equipment manufacturers. In the replacement market for typewriter ribbon and correction tapes, Smith Corona and Pelikan are direct competitors as to supplies for Smith Corona typewriters.

Typewriter ribbons come in two varieties: multi-strike ribbon and single strike film.[1] As a consequence, correction tapes also come in two varieties: cover-up type and lift-off type. Lift-off correction tape is compatible with single strike film, but is ineffective with multi-strike ribbon. Cover-up correction tape is needed when multi-strike ribbon is used.

In 1988, Smith Corona began manufacturing and marketing ink ribbon cassettes and correction tape cassettes for use in its typewriters advertised as having the

---

1. Due to the nature of its design, multi-strike typewriter ribbon may be used in a typewriter for a longer period of time, as it can produce more characters per cassette than single strike ribbon. However, single strike ribbon produces characters of a higher quality.

"Right Ribbon System" feature. The "Right Ribbon System" feature was developed to ensure that the operator would always use compatible ink ribbon and correction cassettes in a Smith Corona typewriter. Smith Corona's '171 utility patent as a whole covers the use of matching structural attributes on the ink ribbon cassette and the correction cassette which ensure compatibility between these cassettes when used in the typewriter. One of the attributes patented is a tab on the ribbon cassette which, when passing through a corresponding notched opening on the roof-like structure of the compatible correction cassette, engages a switch on the typewriter itself. Smith Corona's '070 and '384 design patents cover the physical appearance of the correction cassette.

In the summer and fall of 1988, Pelikan began manufacturing and marketing ink ribbon and correction cassettes for use in Smith Corona typewriters equipped with the "Right Ribbon System" feature. Pelikan's ink ribbon cassettes contained the same structural attributes as Smith Corona's ink ribbon cassettes, i.e., a tab on the left side for multi-strike ribbon and a tab on the right side for single strike film. At this time, the '171 utility patent had not been issued by the Patent and Trademark Office. However, after the issuance of the '171 utility patent, Pelikan continued to manufacture its ink ribbon cassettes with the same structural attributes as Smith Corona's cassettes.

Also, prior to the issuance of the three patents-in-issue Pelikan manufactured its correction tape cassettes with the same structural attributes as Smith Corona's correction tape cassettes, i.e., a notch on the left side for cover-up correction cassettes and a notch on the right side for lift-off correction cassettes. In September of 1989, however, Pelikan learned that Smith Corona had applied for a European patent disclosing the same invention as claimed in its application for the '171 utility patent. Upon learning of this application, Pelikan altered the design of its correction cassettes, placing two openings in the roof-like structure of its correction cassettes. This alteration, allowed the user to mismatch a Pelikan correction cassette with the incorrect ink ribbon cassette.

As one of its claims, Smith Corona alleged at trial that Pelikan willfully infringed the '171 utility patent by making, using and selling ink ribbon cassettes embodying the patented invention of the '171 utility patent, and by actively inducing others to infringe. Specifically, Smith Corona alleged that Pelikan's ink ribbon cassettes infringed claims 11–15 of the '171 utility patent.

Claim 11 of the '171 utility patent reads as follows:

11. A ribbon cassette for a system including a device utilizing a ribbon cassette and a correction tape cassette having a correction tape which are inserted into the device for the operation thereof, the device operating on a flow of electricity and including a switch for controlling the flow of electricity thereto, said ribbon cassette comprising:

a housing having a bottom;

an ink ribbon substantially disposed within said housing; and

means on said ribbon cassette engaging an opening in the correction tape cassette to assure that said ribbon and the correction tape are functionally compatible, said assuring means conditioning the switch to control the flow of electricity to the device.

See exhibit A to Pelikan's motion for summary judgment (filed November 26, 1990; Docket Entry No. 36).

Claims 12 and 13 are dependent on claim 11. Claim 14 is dependent on claim 13.

Claim 15 reads as follows:

15. A ribbon cassette for a system including a device utilizing a ribbon cassette and a correction tape cassette having a correction tape, said ribbon cassette being inserted into the device for the operation thereof, said ribbon cassette comprising:

a housing having a top surface and a bottom surface;

an ink ribbon substantially disposed within said housing; and

a tab portion extending from a specified side portion of the bottom surface of said ribbon cassette, said tab portion matingly engaging and extending through an opening located in a corresponding side portion of the correction tape cassette for assuring that said ink ribbon and the correction tape are functionally compatible and, in the event that said tab does not engage the opening, for indicating that said ribbon and the correction tape are not functionally compatible with each other.

*See id.*

Smith Corona also alleged that the Pelikan correction cassettes infringed the '070 and '384 design patents.

The trial was bifurcated on the issues of liability and damages. At the close of the evidence of the liability portion of the trial, the Court instructed the jury as follows:

Claims 11–15 of the '171 utility patent are drawn to the ribbon cassette alone, and not to the combination of the ribbon cassette, correction cassette and typewriter switch. References in claims 11–15 to the correction cassette and typewriter switch merely describe how the claimed invention functions in its intended environment and, thus, only constitute limitations to the claims for the purposes of distinguishing prior art.

Jury instructions (filed March 13, 1991; Docket Entry No. 213), p. 30. This instruction was given to the jury based on the Court's reading of *In re Stencel*, 828 F.2d 751 (Fed.Cir.1987).[2]

After a period of deliberation, the jury found that 1) the three patents-in-issue were not invalid; 2) that Pelikan had infringed the three patents; 3) that Pelikan had induced others to infringe these patents; 4) that this infringement had been willful; 5) that Pelikan's advertising was false, misleading and deceptive in violation of Section 43 of the Lanham Act and in violation of the Tennessee Consumer Protection Act; and 6) that Pelikan's false, misleading and deceptive advertising was willful. *See* verdict of the jury (filed March 1, 1991; Docket Entry No. 202). After further proof on the issue of damages, the jury returned its assessment of compensation. *See* compensatory damages verdict of the jury (filed March 13, 1991; Docket Entry No. 215).

After accepting the verdict of the jury, the Court ordered the Clerk to reserve judgment entry for additional cost assessments regarding prejudgment interest and willfulness. *See* Clerk's resume of Court proceedings (filed March 13, 1991; Docket Entry No. 214). On March 19, 1991, the Court entered an order (Docket Entry No. 237) which permanently enjoined Pelikan from 1) making, using or selling the products which the jury found had infringed the three patents-in-issue; and 2) using certain phrases in connection with its advertising, packaging and promotion of its products which the jury found had violated the Lanham Act and the Tennessee Consumer Protection Act.

## II. MOTION FOR JNOV.[3]

### A. Standard of Review.

■ In ruling on a motion for a directed verdict, the Court must determine whether,

2. The Court stated the reasons for its reliance on *In re Stencel* in its denial of Pelikan's motion for a directed verdict at the close of Smith Corona's proof. *See* trial transcript of February 21, 1991 (filed February 28, 1991; Docket Entry No. 216), pp. 1366–76.

3. On May 1, 1991, Smith Corona filed a motion to strike Pelikan's motion for JNOV/new trial (Docket Entry No. 266), alleging that Pelikan's motion was untimely filed due to its appeal to the Federal Circuit of this Court's permanent injunction. Smith Corona argued that "[a]ll issues relating to the merits, upon which the permanent injunction was entered, have been

removed from the district court to the Federal Circuit."

On April 11, 1991, the Federal Circuit entered an order which partially stayed this Court's injunction. *See* exhibit B to Pelikan's motion to continue stay. However, on May 21, 1991, the Federal Circuit vacated its stay order, noting that it lacked jurisdiction under Rule 8, Fed. R.App.P., because Pelikan had filed no notice of appeal. Accordingly, this Court finds that Smith Corona's motion to strike is not well taken. As no notice of appeal was filed by Pelikan, jurisdiction remained with this Court, and Pelikan's motion for JNOV/new trial was

considering the evidence in the light most favorable to the plaintiff and indulging in every reasonable inference favorable to the plaintiff, there is evidence from which the jury might rationally find a verdict in favor of the plaintiff. *See Cecil Corley Motor Co., Inc. v. General Motors Corp.*, 380 F.Supp. 819, 827 (M.D.Tenn.1974). If there is evidence from which a reasonable jury could return a verdict in favor of the plaintiff, the motion for a directed verdict must be denied.

■ The accepted standard for determining whether a jury verdict should be set aside and judgment entered in favor of the moving party is essentially the same as a motion for a directed verdict, i.e.,

> to look at all the evidence, to take as true the evidence for the plaintiff, to discard all countervailing evidence, to take the strongest legitimate view of the evidence for the plaintiff, to allow all reasonable inferences from it in his favor; and if then there is any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the whole evidence, the motion ... must be denied.

*Chumbler v. McClure*, 505 F.2d 489, 491 (6th Cir.1974) (citation omitted).

■ There are various formulations of this test as reflected in *Morelock v. NCR Corp.*, 586 F.2d 1096, 1104 (6th Cir.), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979). But, in sum, the issue to be determined is "whether there is suffi-

cient evidence to raise a question of fact for the jury. [Citation.] [T]he trial court may neither weigh the evidence, pass on the credibility of witnesses nor substitute its judgment for that of the jury." *Id.* The motion should not be granted unless the evidence is uncontradicted and a reasonable mind could only draw one conclusion from the evidence. *See Green v. Francis*, 705 F.2d 846, 849 (6th Cir.1983).

### B. Issues Presented.

#### 1. *In re Stencel.*

■ As the crux of its JNOV motion, Pelikan argues that "this Court applied a strained[4] and improper interpretation of *Stencel* ... concluding and improperly instructing the jury that Claims 11–15 [of the '171 utility patent] are drawn to an ink ribbon cassette alone." Pelikan's brief in support of JNOV motion, p. 14. Pelikan first made this argument in its brief in support of its motion for summary judgment (filed November 26, 1990; Docket Entry No. 36), in which Pelikan argued that claims 11–15 are drawn to a combination of the ink ribbon cassette, correction cassette and typewriter switch. *See* Pelikan's brief in support of summary judgment motion, pp. 36–45. As a consequence of finding that claims 11–15 are drawn to this combination, Pelikan argues that it did not infringe the '171 patent because it manufactured only one component of the combination. *See* Pelikan's brief in support of JNOV motion, p. 12 ("Pelikan's print ribbon

timely filed, the Court denies Smith Corona's motion to strike.

4. While called upon to address a variety of esoteric questions of federal patent law, the burden of this Court has been compounded by the propensities of counsel for both parties to engage in gratuitous and incendiary commentary on the matters of this lawsuit. Though the trial of this action is over, the parties continue to fire salvos at each other via their papers. By way of example, the Court notes Pelikan's assertion that "counsel for Smith Corona decided to use whatever means necessary (including preparing its witnesses to spew forth 'the party line' whenever they thought they had the opportunity) in order to present arguments calculated to mislead and confuse the jury." Pelikan's brief in support of motion for JNOV, p. 50. Pelikan further accuses Smith Corona of "bad faith liti-

gation tactics [which] infected the entire proceedings...." *Id.* at 51. Not to be outdone, Smith Corona describes Pelikan's argument on the issue of Smith Corona's alleged improprieties at trial as "an 18 page harangue...." *See* Smith Corona's memorandum in opposition to JNOV motion, p. 44. Other such exchanges are too numerous to mention.

It is abundantly clear to the Court that there has been no love lost between these litigants, or their respective attorneys. However, as a consequence of this unnecessary and unprofessional bickering, the only thing "strained" during the course of this lawsuit has been the patience of the Court. Accordingly, it is the profound hope of the Court that the parties refrain from such indecorous conduct before the Federal Circuit if and when this case is appealed.

cassette cannot meet these limitations without the presence of a correcting cassette or a device having an on-off switch"); *see also* Pelikan's brief in support of summary judgment motion, pp. 37–38 ("[b]ecause these claims are for a combination, Pelikan's manufacture and sell [sic] of an unpatented ribbon cassette of cooperative components cannot, as a matter of law, constitute infringement of the '171 patent.").

In support of this argument, Pelikan primarily relies, as it did in its motion for summary judgment, on *Wells Manufacturing Corp. v. Littlefuse, Inc.*, 547 F.2d 346 (7th Cir.1976) and *Shure Brothers, Inc. v. Korvettes, Inc.*, 198 U.S.P.Q. (BNA) 283 (N.D.Ill.1978), two cases which predate the creation of the Federal Circuit. After reviewing *Wells Manufacturing, Shure Brothers, Stencel,* and the other cases cited by the parties, the Court remains convinced that, based on its interpretation of *Stencel,* "[p]atentability *can* be predicated upon how a claimed item mates with another item *without* claiming the combination of the two items." Smith Corona's memorandum in opposition to summary judgment motion (filed December 19, 1990; Docket Entry No. 47), p. 23 (emphasis in original).

In *Shure Brothers,* the District Court for the Northern District of Illinois considered, in part of its opinion, two patents, owned by Shure Brothers, which covered phonograph needles. Korvettes argued that the claims in these two patents were really claims for a combination of a needle (an "armature-stylus subassembly") and a magnetic pick-up cartridge into which the needle fits. Korvettes argued that "since these claims refer to a combination, and Korvettes sells only one unpatented part, then as a matter of law, no infringement could be proved." *Shure Brothers,* 198 U.S.P.Q. at 285. The district court agreed.

Each of the relevant claims in the two patents owned by Shure Brothers began with the following preamble:

> An armature-stylus subassembly for a magnetic pickup cartridge comprised of two electromagnetic systems each terminating in a pair of spaced-apart pole pieces arranged to describe a common magnetic gap and to form a socket having a recess substantially co-extensive with said gap; said subassembly comprising....

*Id.* at 286–87. Each claim then describes the subassembly.

The district court first found that, because the descriptions of the subassembly all referred to the above-quoted preamble, "[t]hese descriptions [were] not understandable without reference to the preambles." *Id.* at 287. The district court further found that the preambles as quoted above had been inserted into the patent applications in order to distinguish the prior art. *See id.* "This additional language was apparently necessary in order to overcome a rejection on the basis of prior art by the Patent Office Examiner." *Id.* After considering arguments made by Shure Brothers during the prosecution of the patents, the district court concluded that it was "evident that in its presentation to the Patent Office, the plaintiff stressed the cooperative relationship of the total combination of the cartridge with the armature-stylus subassembly." *Id.*

The district court then quoted the decision of the Seventh Circuit Court of Appeals in *Wells Manufacturing:*

> [i]f the preamble merely states a purpose or intended use and the remainder of the claim completely defines the invention independent of the preamble, it is not a limitation on the claims. On the other hand, if the claim cannot be read independently of the preamble and the preamble must be read to give meaning to the claim or is essential to point out the invention, it constitutes a limitation upon the claim.

*Shure Brothers,* 198 U.S.P.Q. at 288 (quoting *Wells Manufacturing,* 547 F.2d at 353).

Applying *Wells Manufacturing,* the district court found that "it is apparent that these should be considered as combination claims.... This interpretation is mandated by the fact that the body of the claims cannot be read independently of the pream-

bles, and because the patent descriptions and filing history indicate that the invention was a combination." *Id.*

*Wells Manufacturing* also stands for the following rule of claim construction: that if (1) the claim elements can be understood "only with reference to the interrelationship of the elements" to the parts of the environment in which the elements are used, *see Wells Manufacturing,* 547 F.2d at 353, and (2) the "inventive quality" of the claim lies in that interrelationship, *see id.,* then (3) the claim must be for a combination of the elements with the parts of the environment. *See id.* at 354.[5]

At trial, Smith Corona argued that the rule of *Wells Manufacturing* and the result of *Shure Brothers* has been rejected by the Federal Circuit Court of Appeals in *In re Stencel, supra,* and that patentability can be predicated upon how a claimed item mates with another without claiming a combination. The Court agreed.

In *Stencel,* the plaintiff appealed the decision of the PTO Board of Patent Appeals, which had affirmed the rejection of his patent application for obviousness based on a combination of prior art patents. Stencel's patent application was for a triangular "driver," which when inserted into a lobed "collar," could turn the collar so as to lock the collar and a hexagonal bolt together. Similar to the preambles in *Shure Brothers,* the preamble of the relevant claim in *Stencel* read as follows:

1. A driver for setting a joint of a threaded collar, a threaded pin, and at least one sheet, the collar having plastically deformable lobes on its longitudinal exterior that upon the existence of a predetermined clamp-up load between the collar and the sheets plastically deform in radial compression and displace material of the collar into void volumes between the collar and the pin to lock the two together and terminate the action of the driver on the collar, the driver comprising....

*Stencel,* 828 F.2d at 752–53. Like claim 11 of the '171 utility patent in this case, one of the four elements of Stencel's claim was a means element which referred to the collar as described in the preamble.[6]

At the PTO Board of Patent Appeals, Stencel argued that the prior art did not teach how to construct a driver usable with Stencel's collar. While the PTO Board of Patent Appeals agreed that " 'there is a fundamental difference between the failure mechanism effected by the driver disclosed in the [prior art] from that disclosed in the present application,' " *Stencel,* 828 F.2d at 754 (quoting the opinion of the PTO Board of Appeals), the Board affirmed the rejection because " 'the claims here are directed to the *driver per se* and *not* to the action of the fastener during the tightening procedure.' " *Id.* (quoting the opinion of the PTO Board of Appeals) (emphasis added).

On appeal before the Federal Circuit, the Commissioner of the PTO restated its position and argued that the limitations in the preamble were "not distinguishing feature[s] of the driver, but of the collar." *Id.* at 754. Stencel, however, argued that the structure of the driver as claimed is limited by the environment in which it was intended to function. *See id.* ("[a]ppellant points out that the driver as claimed is indeed limited as to structure, the limiting structure being defined by the structure of the collar.").

Clearly, the preamble of Stencel's attempts to describe the interaction and relationship between the driver, the collar and the bolt (i.e., the "pin"). Yet, like the patent examiner and the Board of Patent Appeals, the Federal Circuit construed the patent as claiming the driver alone, and not a combination of the driver and the collar. *See id.* at 752 ("[t]he claimed invention *relates to a driver* that is adapted to set a joint with a particular threaded collar.")

---

5. Both parties seem to agree that *Wells Manufacturing* articulates this rule. *See* Smith Corona's memorandum in opposition to summary judgment motion, p. 31 *and* Pelikan's reply to Smith Corona's memorandum (filed January 2, 1991; Docket Entry No. 71), p. 4 n. 1.

6. Unlike claim 11 of the '171 patent, however, Stencel's claim had a second element which also referred to the collar.

(emphasis added). In reversing the PTO Board of Appeals, the Federal Circuit accepted Stencel's argument, stating that

> [a]s a matter of claim draftsmanship, appellant is not barred from *describing the driver in terms of the structure imposed upon it by the collar* having plastically deformable lobes. The framework—the teachings of the prior art—against which patentability is measured is not all drivers broadly, but drivers suitable for use in combination with this collar, for the claims themselves are so limited.

*Id.* (emphasis added).

While the Federal Circuit did use the phrase "for use in combination with this collar," it is clear from the opinion that the Court did not find Stencel had claimed the combination of the driver and collar in his patent application. As stated above, the Federal Circuit began its opinion by noting that "[t]he claimed invention *relates to a driver....*" *Id.* at 752 (emphasis added). Further in its opinion, the Federal Circuit stated that "Stencel is not inhibited from *claiming his driver,* limited by the statement of its purpose, and further defined by the remaining clauses of the claims at issue, when there is no suggestion in the prior art of a driver having the claimed structure and purpose." *Id.* at 755 (emphasis added). Thus, under *Stencel,* an applicant may define and limit an invention in terms of that invention's intended environment without claiming the environment as part of a combination with the invention.

As the Court stated on the record,[7] the Court believes that *Stencel* has overruled the method of analysis utilized in *Wells Manufacturing,* despite the fact that the Federal Circuit did not cite that case. Had the Federal Circuit applied the *Wells Manufacturing* analysis to the Stencel claim, it would have concluded either (a) that the Stencel claim was directed to the combination of the driver and the collar, or (b) that the Stencel claim could not rely on the interaction of the driver with the collar to support patentability of a claim to the driver alone. The Federal Circuit did neither.

Following its reading of *Stencel,* this Court held at trial that claims 11 and 15 of the '171 utility patent do exactly what the Stencel claim did, i.e., describe a device in terms of the structure imposed upon it by its intended environment and desired function. The Court does not retreat from this ruling. Like Stencel's claimed invention, claims 11–15 of the '171 utility patent do not claim all typewriter ink ribbon cassettes broadly, but ink ribbon cassettes designed to function in the described environment of compatible correction cassettes and typewriter switches. Thus, claims 11–15 are directed only to the ribbon cassette *per se,* as limited by the description of the "system" in the preambles of claims 11 and 15.[8]

This conclusion is further supported by the prosecution history of the '171 utility patent.[9] *See Unique Concepts, Inc. v. Brown,* 939 F.2d 1558, 1561 (Fed.Cir.1991) ("[t]o ascertain the meaning of claims, [a

---

**7.** See footnote 2, *supra.*

**8.** In arguing that the Court has misread *Stencel,* Pelikan asserts that the holding in that case is entirely consistent with the holdings of *Shure Brothers* and *Wells Manufacturing* because all three cases stand for the proposition that, if it is necessary to rely on the preamble of a claim to define patentability over the prior art, the preamble constitutes a limitation of that claim. *See* Pelikan's brief in support of JNOV motion, p. 8. To be sure, the Court in *Stencel* stated that "[w]hether a preamble of intended purpose constitutes a limitation to the claims is, as has long been established, a matter to be determined on the facts of each case in view of the claimed invention as a whole." *Stencel,* 828 F.2d at 754. In that case, the Federal Circuit found that

Stencel's claim was so limited. This is consistent with *Shure Brothers* and *Wells Manufacturing. See Shure Brothers,* 198 U.S.P.Q. at 288 and *Wells Manufacturing,* 547 F.2d at 353. Indeed, the Court charged the jury in this regard. *See* jury instruction, *supra.*

This does not mean, however, that a patent applicant automatically claims a *combination of components* simply because those components are recited in the preamble of a claim and limit the invention. *Stencel* does not stand for such a conclusion.

**9.** The prosecution history, or "file wrapper," of the '171 patent was filed in an appendix to Smith Corona's memorandum in opposition to summary judgment. *See* separate attachment to Docket Entry No. 47 (filed December 19, 1990).

464

court must] consider three sources: the claims, the specification, and the prosecution history.").

When originally filed, Smith Corona's patent application contained ten claims. *See* appendix to Smith Corona's memorandum in opposition to summary judgment motion, pp. 891–893. Each of these claims were drawn to the entire system, i.e., the combination of the ribbon cassette, the correction cassette, and the switch on the typewriter. *See id.* These claims were rejected by the patent examiner. *See id.* at 898–908.

In response to this initial rejection, Smith Corona filed an amendment to its application in which it added claims 11–24. *See id.* at 990, 999–1002. Of these additional claims, claims 11–16 recited "a ribbon cassette," while claims 17–21 recited "a correction tape cassette." *See id.* at 999–1001. In the amendment, the patent attorney who prosecuted the application twice represented to the patent examiner that "[a]s hereinafter noted, *claims 11–16 relate to a first or ribbon cassette* used in the system of the invention." *Id.* at 1003 (emphasis added); *see also id.* at 1004 ("[a]pplicants submit herewith additional claims 11–24 which are intended to more completely define the present invention. *Claims 11–16 relate to a first or ribbon cassette....*") (emphasis added). In explaining the proper construction of claims 11–16, the patent attorney stated

*[c]laims 11–16 are directed to a ribbon cassette having an ink ribbon, which is used in a system including a device utilizing a ribbon cassette and a correction tape cassette,* the ink ribbon cassette having means engaging an opening in the correction tape cassette to assure that the ribbon and the correction tape are functionally compatible. It is respectfully submitted that neither the primary reference ... nor the secondary references [in the relevant prior art] disclose or suggest a ribbon cassette having means engaging an opening in a correction tape cassette for assuring that the ink ribbon in the first cassette and the correction tape in a second cassette are functionally compatible. The cited refer-

ences, alone or combined together do not suggest or contemplate any means for assuring functional compatibility....

*Id.* at 1014 (emphasis added).

Despite these amendments, the patent examiner again rejected Smith Corona's application. *See id.* at 1019–1025. While this was a final rejection from the patent examiner, the examiner "suggested that upon suitable amendment to avoid the rejections thereof, and if claim 15 is rewritten as a formal independent claim which includes all of the limitations of its parent claim 11, claims 1–10, inclusive, 15, and 22–24, inclusive, will be reconsidered with a view towards allowance." *Id.* at 1025.

In response to this final rejection, Smith Corona filed a notice of appeal to the Board of Appeals. *See id.* at 1031. In furtherance of this appeal, Smith Corona again amended its application. *See id.* at 1032–1048. While it did not cancel claims 11–14 and claim 16 from its application, Smith Corona cancelled claim 15, and amended claim 11 to incorporate the subject matter of claim 15. *See id.* at 1034. Smith Corona acknowledged that, by incorporating claim 15 into claim 11, it was following the suggestion of the patent examiner. *See id.* at 1038. Claim 16, renumbered as claim 15, was also amended. *See id.* at 1034.

The Court notes that, in its discussion of these amendments, Smith Corona again asserted that its new claim 15 recited a ribbon cassette. *See id.* at 1039 ("[c]laim 16 [renumbered as claim 15], *claiming a ribbon cassette,* and claim 21, claiming a correction cassette, have ... been amended to specify that the tab portion in claim 16 and the opening of claim 21 are placed on specified sides of the cassette housing to assure the functional compatibility of the cassettes.") (emphasis added). Further, Smith Corona addressed the patent examiner's rejection of claims 11–14 and 16–21 for obviousness in view of the prior art. Disagreeing with the patent examiner's rejection, Smith Corona argued that

[t]he present invention provides unique ink ribbon and correction tape cassettes, each having *structure* which assures

functional compatibility of the ink ribbon cassette with the correction tape in the tape cassette. Furthermore, that same structure may also be used to condition a switch in the typewriter to activate that device only when such functional compatibility results.

*Id.* at 1041 (emphasis in original). Smith Corona continued by emphasizing the differences between its claimed invention and the prior art, stating that while the prior art references may describe inventions "designed to secure the cassettes relative to each other for operation as a unit," *id.* at 1044, "neither [of the prior art references] disclose or suggest the desirability of maintaining functional compatibility between the ink ribbon and correction tape cassettes." *Id.* at 1047.

Smith Corona's claims, as amended, were allowed and the '171 patent issued.[10]

Based on the file wrapper of this patent, the Court finds that, at all times during the prosecution of its application, Smith Corona represented to the patent examiner and to the Board of Appeals that claims 11–15 of the '171 patent were drawn to a ribbon cassette having a "structure which assures functional compatibility of the ink ribbon cassette with the correction tape in the tape cassette." *Id.* at 1041 (emphasis deleted). Further, nothing in file wrapper indicates that the patent examiner or the Board of Appeals construed these claims as reciting a combination between the ribbon cassette, the correction cassette, and the typewriter switch. Accordingly, the Court finds that the proper construction of claims 11–15 in the '171 patent is to the ribbon cassette alone, and that its instruction to the jury on this issue was a correct statement of law.

Pelikan relies on *Gerber Garment Technology, Inc. v. Lectra Systems, Inc.*, 916 F.2d 683 (Fed.Cir.1990). The Court finds this case inapposite.

In *Gerber*, the patent holder filed an original patent application for an automatic fabric cutting device which utilized a cut-

ting apparatus and a means to hold the fabric in place during the cutting operation. *Gerber*, 916 F.2d at 684. This holding means employed the use of a vacuum to hold a multi-layered stack of fabric during the cutting of the fabric. *Id.*

During the prosecution of the original patent application, the patent examiner imposed a restriction requirement between " 'Claims 1–11 and 16–28 drawn to the cutting apparatus' and 'Claims 12–15 drawn to the work holding means.' " *Id.* (quoting the patent examiner). Gerber elected to prosecute the claims drawn to the cutting apparatus and the patent issued as No. 3,495,492. After the issuance of the '492 patent, Gerber prosecuted a continuation application for the work holding means. After four years of prosecution, the patent issued as No. 3,790,154.

The issue before the Federal Circuit was whether claims 15 and 16 of the later '154 patent were invalid for obviousness-type double patenting in view of claim 23 of the prior '492 patent.

The preamble of Claim 15 of the '154 patent stated:

[i]n a machine having a tool in the form of a cutting blade adapted to normally pass through and beyond an object in a cutting operation, an apparatus for holding the object in a rigid condition while it is worked on by the cutting blade, said apparatus comprising....

*Id.* at 685. Claim 16 was dependent upon claim 15.

As one argument before the Federal Circuit, Gerber asserted that claims 15 and 16 of the '154 patent were not invalid for obviousness-type double patenting because claim 15 "is directed to the subcombination of a work holding means [i.e., the vacuum holding device,] in the 'environment' of a machine having a cutting tool." *Id.* at 688. The Federal Circuit disagreed.

The Federal Circuit found that the cutting blade as mentioned in the preamble of claim 15 was " 'necessary to give meaning'

---

10. Smith Corona filed a terminal disclaimer to cure the patent examiner's "double patenting" rejection. *See id.* at 1055. This disclaimer, however, only pertains to the duration of the anticipated '171 patent, and does not address in any way the issue of claim construction.

to claims 15 and 16 and 'properly define the invention.' " *Id.* at 689 (citation omitted).

The cutting blade appears not only in the preamble, but is referenced repeatedly in the body of the claim. It is integral to the claim itself.... Hence, the cutting blade is not merely an aspect of the claim environment, but an affirmative limitation of claim 15.

*Id.* at 689.

In arriving at this conclusion, however, the Federal Circuit cited to the prosecution history of the '154 patent and noted that, in an amendment to its application, Gerber had "referred to the cutting blade as a limitation of claim 15 and relied on the cutting blade penetration of the support means to distinguish the prior art." *Id.* Further, "[i]n its brief, Gerber agree[d] that the cutting blade may be a limitation without which there can be no infringement." *Id.* No such concessions are made by Smith Corona now, nor were any made during the prosecution of its application. Therefore, *Gerber* is distinguishable on its facts.

Pelikan also cites the testimony of Mr. Charles L. Gholz, Smith Corona's expert witness, as support for its position. As stated above, claim 11 of the '171 patent reads in part "means on said ribbon cassette engaging an opening in the correction tape cassette ... said assuring means conditioning a switch...." Mr. Gholz testified as to this portion of claim 11 as follows:

MR. GHOLZ: [Claim 11 is not] an A-plus claim and it's above an F claim. It's a good deal above an F. This is a B—B-minus claim. It's pretty good except for that one thing.

THE COURT: What one thing?

MR. GHOLZ: Leaving out the word "for."

THE COURT: Where leaving out the word for?

MR. GHOLZ: In the last paragraph, "means on said ribbon cassette for engaging an opening in the correction tape cassette to assure that said ribbon and the correction tape are functionally compatible."

If it said that, we wouldn't have this dispute.

Trial transcript of February 15, 1991 (filed March 15, 1991; Docket Entry No. 221), pp. 780–81. Mr. Gholz testified further that "this is a little embarrassing but when I read it, I read right through it and read the word 'for'. I assumed it was there and you had to point out to me that it actually wasn't there. I expected it to be there." *Id.* at 782.

Pelikan argues that

[t]he admission by Smith Corona's expert that the claim required the insertion of the word "for" before the word "engaging" in Claim 11 is significant in light of that witness' further opinion that a claim should be interpreted based upon the "plain meaning" of the language of the claim.... The language of claim 11 is plain and unambiguous. Thus, the insertion of the word "for" is not required for clarity and is inconsistent with the statements made by Smith Corona to the patent examiner for purposes of patentability.

Pelikan's brief in support of JNOV motion, p. 14.

The fact remains, however, that the word "for" was not present in the means element of the patent-in-issue in *In re Stencel.* In *Stencel,* the appellant's claim read "means on body to receive a wrenching torque applied to the driver...." *Stencel,* 828 F.2d at 753. The claim did not say "means on body for receiving...." Nevertheless, the Federal Circuit stated that "[t]he claimed invention relate[d] to a driver," *id.* at 752, rather than finding that the invention recited a combination of the driver and the collar. Therefore, the Court finds that the absence of the word "for" in claim 11 is insufficient to find that the claim describes a combination.

■ Finally, Pelikan argues that, even if the Court's interpretation of claims 11–15 is correct, a JNOV still must be awarded because, those claims are invalid in view of the prior art, *see* Pelikan's brief in support of JNOV motion, p. 15–16, and because Pelikan's ribbon cassette, in and of itself, cannot infringe the '171 patent. *See id.* at

16–17. The Court disagrees. As stated above, based on the evidence at trial, the jury found that claims 11–15 of Smith Corona's '171 patent were not invalid in view of the prior art, and further found that Pelikan's ribbon cassette infringed the '171 patent. The Court finds that there was sufficient evidence in the record for these conclusions.

### 2. *Other Claims.*

Pelikan states six other grounds in support of its JNOV motion: the evidence did not support the finding of actively inducing infringement of claims 11–15 of the '171 patent; the evidence did not support the finding of contributory infringement;[11] the evidence did not support the finding of infringement of the '070 and '384 design patents; the evidence did not support the finding of willful infringement; the evidence did not support the finding of false advertising under federal or state law; and the evidence did not support the damage award of the jury. *See* Pelikan's brief in support of JNOV motion, pp. 18–46.

Without reviewing here each and every evidentiary item offered at trial, the Court notes that Pelikan's arguments on these issues—many of which were raised at trial—hinge on an alleged insufficiency of the evidence and credibility of witnesses. In light of the high standard which a movant must meet for JNOV relief and after reviewing the record, the Court finds that Pelikan's arguments are not compelling. The Court finds that there was sufficient evidence in the record to sustain the verdict of the jury on these issues. Accordingly, the Court finds that Pelikan's motion for judgment notwithstanding the verdict should be denied.[12]

### III. MOTION FOR NEW TRIAL.

#### A. Standard of Review.

Like a JNOV motion, "[t]he decision to grant or deny motions for a new trial ... is discretionary with the district court." *Davis by Davis v. Jellico Community Hospital, Inc.,* 912 F.2d 129, 123 (6th Cir.1990). Further,

"[i]n ruling upon a motion for a new trial based on the ground that the verdict is against the weight of the evidence, a district judge must compare the opposing proofs and weigh the evidence and 'it is the duty of the judge to set aside the verdict and grant a new trial, if he is of the opinion that the verdict is against the clear weight of the evidence....' [T]he jury's verdict should be accepted if it is one which could reasonably have been reached."

*Bruner v. Dunaway,* 684 F.2d 422, 425 (6th Cir.), *cert. denied,* 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983) (quoting *TCP Industries, Inc. v. Uniroyal, Inc.,* 661 F.2d 542, 546 (6th Cir.1981); other citations omitted).

After reviewing the proof in this case, the Court finds that the verdict of the jury was reasonable in all respects and not against the clear weight of the evidence.

#### B. "Bad Faith" Trial Tactics of Smith Corona.

As its first basis for its motion for a new trial, Pelikan argues that counsel for Smith Corona employed "bad faith litigation tactics," Pelikan's brief in support of JNOV motion, p. 51, the cumulative effect of which "confused and overwhelmed" the jury and constituted " 'extreme and outrageous' conduct" to Pelikan's prejudicial detriment. *Id.* at 66. The Court disagrees.

---

**11.** In its brief, Pelikan argues that "Smith Corona failed to proffer any evidence at trial relating to the issue of contributory infringement and, as a result, there is no evidence which could support the jury's finding of contributory infringement." Pelikan's brief in support of JNOV motion, p. 19. The Court admits some bewilderment with this argument, because no such finding was made by the jury. Indeed, the Court did not instruct the jury on the issue of contributory infringement, nor did the verdict

form for liability require a finding on this issue. As stated above, the jury found Pelikan liable for direct infringement of the '171 patent, and for actively inducing infringement by third parties.

**12.** Having resolved this issue, Pelikan's request for oral argument (filed May 29, 1991; Docket Entry No. 277) is denied.

As evidence of Smith Corona's improper trial tactics, Pelikan points to a variety of leading questions asked by the plaintiff's counsel; allegedly nonresponsive and gratuitous comments made by witness for Smith Corona; the statements of Smith Corona's two expert witnesses, portions of which were identical; Smith Corona's allegedly improper use of evidence; and allegedly improper closing statements made by the plaintiff's counsel at the close of the liability phase of the trial, and opening statement made at the beginning of the damages phase.

■ Regarding certain leading questions and the opening and closing arguments put forth by counsel for Smith Corona, the Court notes that it promptly and properly provided curative instructions to the jury when it deemed such instructions necessary. Indeed, before the opening arguments of counsel, the Court advised the jury that

certain things are not evidence and must not be considered by you. . . . First the statements, the arguments and questions by lawyers are not evidence. The questions are not evidence. It is the answers that constitute the evidence.

Secondly, the objections to questions are not evidence. Lawyers have a duty to their clients to make objections when they believe evidence being offered is improper. . . . You should not be influenced by the objection or by the Court's ruling on the objection.

. . . .

Now, the third thing that is not evidence and you must not consider is any testimony that the Court has excluded or told you to disregard. . . .

. . . .

Now, we are going to begin the trial of this case with the opening statements of the lawyers. We will hear first from the plaintiff and then from the defendant.

Now, these opening statements are not evidence. Remember the questions, arguments and statements of the lawyers are not evidence. There is nothing to argue about now because there simply isn't any evidence yet. . . . The opening statement is intended for your benefit and it is important. It's designed to give you a road map or a blueprint so that you will understand the contentions of each side of the lawsuit [and] so that you can follow the proof as it unfolds during the trial of the case.

Trial transcript of February 12, 1991 (filed March 15, 1991; Docket Entry No. 218), pp. 5–10. Additionally, in its formal charge to the jury in both the liability and damages phases, the Court instructed the jury that it was to base its verdict "solely upon the testimony and evidence in the case [and] that any statements, objections, or arguments made by the lawyers are not evidence in the case." Jury instructions, p. 2; compensatory damages instructions (filed March 13, 1991; Docket Entry No. 212), p. 2. The Court further instructed the jury that "sympathy or hostility must not enter into your deliberation as jurors no matter what your sympathy or hostility may lead you to think. Sympathy or hostility has no place in the trial of a lawsuit, or in the making up of your minds as to what your verdict shall be." Jury instructions, p. 72.

■ Juries are presumed to follow the instructions given to them by the trial court. See generally Parker v. Randolph, 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713, 723 (1979) (prisoner habeas corpus action); see also id., 442 U.S. at 75 n. 7, 99 S.Ct. at 2140 n. 7, 60 L.Ed.2d at 724 n. 7 ("[t]he 'rule'—indeed, the premise upon which the system of jury trials functions under the American judicial system—is that juries can be trusted to follow the trial court's instructions"). "Were this not so, it would be pointless for a trial court to instruct a jury. . . ." Id. 442 U.S. at 73, 99 S.Ct. at 2139, 60 L.Ed.2d at 723. After reviewing the instructions recited above, and the incidental instructions given during the trial, the Court finds no reason to believe that the jury was either "confused" or "overwhelmed." This was a hard-fought trial in which counsel for *both* parties zealously advocated the positions of their respective clients. While the proceedings were quite acrimonious at times, the Court finds that none of the conduct cited by

Pelikan, even viewed from a cumulative perspective, rises to such a prejudicial level as to warrant a new trial. Had it been otherwise, the Court would have ordered a mistrial.

 Regarding the allegedly nonresponsive comments of some Smith Corona witnesses, and the identical statements of Smith Corona's experts, the Court believes that such matters are fair game for cross examination, rebuttal proof, and closing arguments. Pelikan does not show, and the Court cannot find, any unfair prejudice as a result of these statements.

 Finally, regarding Smith Corona's allegedly unfair use of evidence, Pelikan cites two instances in which Smith Corona attempted to introduce improper evidence at trial. *See* Pelikan's brief in support of JNOV motion, pp. 52–57. However, on both those occasions, the Court sustained Pelikan's objections and ruled the proffered exhibits inadmissible. Pelikan can hardly argue that it was prejudiced by these rulings.

 As a third instance of Smith Corona's allegedly improper use of evidence, Pelikan cites Smith Corona's use of a trade show transparency as an example of its advertising of the Right Ribbon System. *See id.* at 57–60. Here again, however, Pelikan acknowledges that it cross-examined Smith Corona's witness on this issue and elicited testimony tending to show that the exhibit was not representative of Smith Corona's public advertising. Thus, Pelikan suffered no harm.

#### C. The '171 Patent Instruction.

As with its motion for a JNOV, Pelikan argues that the Court's instruction in regard to the construction of the '171 patent was improper and that a new trial should be granted. For the reasons stated above, the Court rejects this argument.

#### D. Design Patent Infringement.

Pelikan urges four grounds for a new trial on the issue of design patent infringement. The Court finds none of these grounds compelling.

 As its first ground, Pelikan argues that the Court improperly allowed the testimony of Mr. Robert DiPaolo, an allegedly unqualified expert witness. The Court disagrees.

Under Rule 702, Fed.R.Evid., the Court may admit into evidence the testimony of an expert witness "if scientific, technical, or other specialized knowledge will assist the trier of fact...." However, the Court "has broad discretion in admitting and excluding expert testimony. *Mayhew v. Bell Steamship Co.*, 917 F.2d 961, 962 (6th Cir. 1990). *See also Hanson v. Parkside Surgery Center*, 872 F.2d 745, 750 (6th Cir.), *cert. denied*, 493 U.S. 944, 110 S.Ct. 349, 107 L.Ed.2d 337 (1989). Further, as the Advisory Committee's notes explain, "[w]hether the situation is a proper one of the use of expert testimony is to be determined on the basis of assisting the trier." *See also Mannino v. International Manufacturing Co.*, 650 F.2d 846, 849 (6th Cir. 1981). The Court finds that it properly exercised its discretion in allowing Mr. DiPaolo to testify, as he was qualified to render an opinion on the issue of design patent infringement and his opinion would assist the jury on the issue of design infringement. The Court notes that counsel of Pelikan reviewed Mr. DiPaolo's background extensively on cross-examination. Any deficiencies in his qualifications were proper points for closing argument and consideration by the jury. Indeed, the Court instructed the jury that expert opinions "should be carefully weighed ... with regard to the expert's education, training, experience, and sources of knowledge...." Jury instructions, p. 11. The Court finds no unfair prejudice due to Mr. DiPaolo's testimony.

 As its second and third grounds for a new trial, Pelikan argues that Smith Corona structured its design patent infringement case around an improper "strip away" legal theory which misled and confused the jury, and improperly expanded this theory with the rebuttal testimony of its expert Mr. Charles Curley. This argument is meritless.

As the Court instructed the jury,

a design patent is invalid if the attributes claimed are *primarily functional.* This is not to say that a design patent is invalid when the decorative attributes claimed are part of a utilitarian item, or when the decorative attributes claimed serve some functional role. Rather, a design patent is invalid if the function of the utilitarian item *dictates* a design in order for the item to perform its intended purpose.

Jury instruction, pp. 57–58 (emphasis in original). The Court based this instruction upon *Avia Group International, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1563 (Fed.Cir.1988), and Smith Corona's theory conformed with this statement of law. Pelikan simply makes the conclusory statement, without citing proof or precedent, that it was prejudiced by this theory and by Mr. Curley's testimony. The Court finds no unfair prejudice.

▮ Finally, Pelikan argues that the Court misinstructed the jury with the following charge:

One factor to consider with respect to Pelikan's good faith and due care in determining the infringement and validity issues is whether Pelikan obtained and followed competent legal advice from counsel after having actual notice of Smith Corona's patent and before beginning the allegedly infringing activities, or, if such activities had already begun when Pelikan received actual notice of Smith Corona's patent, before continuing the allegedly infringing activities. A good faith opinion means an opinion based on a reasonable examination of the facts and law relating to the validity and infringement issues, consistent with the standards and practices generally followed by competent lawyers. Moreover, you should consider whether Pelikan actually relied upon and followed its counsel's opinion.

To the extent that Pelikan has put into evidence no opinion of counsel on any issue, you may infer that either no legal advice was sought on that issue or that such advice was sought and the advice was adverse to Pelikan's interest.

Jury instructions, pp. 61–62.[13] Specifically, Pelikan objects to the second paragraph of the above instruction, arguing that "the law simply does not require a written opinion of counsel to avoid a finding of willfulness." Pelikan's brief in support of JNOV motion, p. 72.

This instruction was based on *Fromson v. Western Litho Plate and Supply Co.,* 853 F.2d 1568 (Fed.Cir.1988), in which the Federal Circuit stated that "[w]here the infringer fails to introduce an exculpatory opinion of counsel at trial, a court must be free to infer that either no opinion was obtained or, if an opinion were obtained, it was contrary to the infringer's desire to initiate or continue its use of the patentee's invention." *Fromson,* 853 F.2d at 1572–73. Thus, while the law may not *require* an opinion of counsel, written or otherwise, *see, e.g., Rolls–Royce Limited v. GTE Valeron Corp.,* 800 F.2d 1101, 1109 (Fed.Cir. 1986), it is quite clear that a jury is permitted to draw negative inferences from the lack of such an opinion.

### E. Willful Patent Infringement.

Pelikan argues, as another ground for its new trial motion, that the Court improperly excluded testimony in regard to an opinion from Mr. John Earley, Pelikan's outside patent attorney, and that this exclusion prevented Pelikan from refuting Smith Corona's allegation of willful infringement. In a footnote, Pelikan further argues that the Court erred in excluding from evidence all testimony regarding a memo written by Mr. Christian Donle, an intern at Pelikan's trial counsel's firm. Pelikan's arguments are meritless.

#### 1. *The "Donle memo."*

▮ During the course of this litigation, the Court devoted a great deal of time to the evidentiary issues of Pelikan's purported legal opinions. Prior to trial, the

---

**13.** This instruction was not restricted to the issue of design patent infringement, but was part of the charge relating to Smith Corona's allegation of willful infringement of all three patents-in-issue. However, the Court discusses this instruction here, because the parties have done so.

Court addressed Smith Corona's motion in limine to exclude evidence of opinion of counsel as follows:

> THE COURT: All right. We'll take up Plaintiff's motion in limine to exclude evidence regarding any opinion of counsel concerning design patent.
>
> Who's going to speak to that?
>
> MR. CHERRY [for Smith Corona]: I'll speak to that for the Plaintiff, Your Honor.
>
> It's our motion.
>
> Very simply, the Defendants are relying on opinion by Mr. John Earley with regard to the '171 utility patent, but Mr. Earley will not give any opinion either orally or written regarding the design patent.
>
> I went to Pittsburgh, took his deposition, inquired into his opinions, and confirmed that he made no opinion regarding the design patent.
>
> It was at that deposition when that colloquy took place you referred to earlier, Your Honor. I tried to find out if there was going to be any opinion regarding the design patent, and to this date, there is no opinion regarding the design patent.
>
> I am concerned that Mr. Polak [President and CEO of Pelikan] will say that he relied on advice of counsel, but if he says that, I don't know what that advice is. The only thing that has come up is a memo written by a German lawyer to Mr. Wettach, one of the Defendant's trial attorneys, but that does not seem to be an opinion, but even if it were, it's not adequate. It's by a German lawyer, not a United States lawyer. I believe the gentleman's name is Christian Donle, and he's not listed as a witness, and that note is not listed as an exhibit at this trial.
>
> So it seems to me that there's just no opinion regarding design patent. And I'm concerned not to have the Jury told there is one without my knowing there is ahead of time, and being able to interrogate the attorney who wrote it or gave it.
>
> THE COURT: All right. What does the Defendant say?
>
> MR. McELROY [for Pelikan]: Your Honor, there is not going to be a written opinion of counsel concerning the design patent. There is, however, testimony that will be offered on the issue of willfulness that Mr. Polak was furnished a copy of the memo from Mr. Christian Donle, which has been furnished to the Plaintiff, and he discussed that memo, and the conclusions are contained in the memo with Mr. Wettach.
>
> . . . .
>
> The question of willfulness, if Your Honor please, is based on totality of the circumstances. It's a fact-based question that is intended to ascertain whether the alleged infringer had any reasonable basis to believe that his conduct was not infringing.
>
> If Your Honor please, the memo was written, prepared by Mr. Donle, is very detailed in its analysis of both facts and law.
>
> The Plaintiff has been furnished with a copy of that memo, was furnished with it early on in the litigation. At the time Mr. Polak was deposed, he stated that he had received and relied upon the advice of counsel that there was no infringement related to the design patent. The fact that it is not a written opinion letter seems to be what we are arguing this motion about.

Trial transcript of February 11, 1991 (filed February 25, 1991; Docket Entry No. 187), pp. 14–17. Mr. McElroy further stated that Mr. Polak would testify that he received the Donle memo—which addressed the design patent of Smith Corona, and the law related to design patents—*"and discussed that memo,* conclusions in it, *with Mr. Wettach, and was assured by Mr. Wettach,* confirmed by the information in the memorandum, *that there was no infringement in this case"* of Smith Corona's design patents. *Id.* at 17–18 (emphasis added).

Thereafter, the Court entertained extensive arguments on the admissibility of legal opinions to refute the allegation of willful infringement of Smith Corona's design patents. *See id.* at 17–35. During this time,

the Court read from portions of the deposition of Mr. John Earley, in which counsel for Smith Corona attempted to establish what opinion of counsel Mr. Polak was relying on regarding this issue. *See id.* at 28–34. While reviewing Mr. Earley's deposition, the Court found that "[t]here's no question that this was a run-around at pages 43 through 48 in the colloquy. I don't know how you could have asked more pointed, clearer, Mr. Cherry, about whether there's going to be something advanced on this [issue.]" *Id.* at 28. At one point, the Court stated to Mr. Wettach that he had achieved "a masterpiece of evasion to a straight forward question by your adversary." [14] *Id.* at 29. At another point in the Earley deposition, Mr. Wettach asserted the extraordinary positions that he did not know what Pelikan was relying on to refute Smith Corona's assertion of willful infringement of its design patents, *see id.* at 30; that he did not know whether another attorney would take the stand to testify in regard to an opinion provided to Pelikan on this issue, *see id.* at 31–32; and that a representative of Pelikan's trial attorney's law firm might testify. *See id.* at 32.

From these arguments, the Court learned that Mr. Donle was an intern at the law office of Pelikan's trial counsel; that Mr. Polak discussed the Donle memo with Mr. Wettach, who may have given "assurances" to Mr. Polak that there was no infringement; and that trial counsel for Pelikan were seriously considering having one of their own testify on this issue at trial. In this regard, the Court stated:

> THE COURT: Is there going to be some suggestion that the trial lawyer put his stamp of approval on this opinion, in effect advanced, however advanced indirectly, the credibility of the lawyer trying this case? You're skirting on that Mr. McElroy. It's one thing to say that this intern, no lawyer, but intern, prepared the opinion.... [B]ut it's another thing to bolster that and to attempt to

bootstrap it by saying, well, it's not only the opinion of a student, in training, an intern, but it has the imprimatur of a lawyer in this case, and in effect cloak it with respectability of Mr. Wettach, who is on his feet in the pit of this courtroom. And that has the effect of indirectly putting Mr. Wettach's credibility as a competent lawyer, since, if there is any suggestion he gave his blessing to it, and that is part of what cloaks it, gives it some additional credibility in the eyes of Mr. Polak, then that puts Mr. Wettach in the position of at least indirectly his credibility is at issue. He hasn't testified, but his respectability and his competency and his credibility is being, in a sense, cloaking this opinion upon which the reliance was made, upon which Mr. Polak relied.

*Id.* at 24–25.

> To this, counsel for Pelikan responded:
> MR. McELROY: I don't believe it does.
>
> . . . .
>
> [E]ven if the testimony were that Mr. Polak did—Mr. Wettach did vouch for it, not talking about credibility on factual issues, we're talking about the same advice that Mr. Wettach is going to be arguing as a legal proposition before the Court and the Jury throughout this trial. There are no factual issues of credibility tied up in that. It's a statement of position.

*Id.* at 25–26.

Such an argument is completely untenable. There is a vast difference between rendering a legal opinion to one's client—an opinion rendered dispassionately and objectively to serve that client's best interest—and a legal argument tendered in a courtroom, an adversarial forum where an attorney earnestly advocates the position of the client. For this reason, the Court "preclude[d] any reference in the presence of the Jury, in opening statement or through any question asked or any answer

---

**14.** At this point in the Earley deposition, after establishing that a legal opinion would be introduced on the issue of willful design patent infringement, Mr. Cherry asked: "Who's opinion is that?" *Id.* at 29. Mr. Wettach responded:

"Probably will be the opinion that's been expressed in the pleadings to date with respect to the validity of the design patents that's found in the motion for summary judgment." *Id.*

given, with regard to the advice of counsel on this issue, until it's first explored in the absence of the Jury." *Id.* at 34. The Court similarly excluded the Donle memo, because it was "wrapped up, inextricably intertwined with this question of what advice [Mr. Polak] got, and who he got it from, and whether it amounts to advice of counsel. We don't know where—anything about the qualifications of Mr. Donle." *Id.* at 35.

At trial, just before Mr. Polak took the stand, counsel for Smith Corona raised the question as to whether Mr. Polak could testify in regard to the Donle memo. *See* trial transcript of February 21, 1991, pp. 1378–1408. During a discussion with counsel for both parties, the Court learned that neither the Donle memo, nor any conversation with Mr. Wettach, was identified in Pelikan's answers to Smith Corona's first set of interrogatories as an opinion of counsel upon which it relied. *See id.* at 1379–80. Smith Corona thereafter took the deposition of Mr. Polak, at which he testified that there may have been a written opinion with regard to the Smith Corona design patents that he also relied upon. *See id.* at 1380. When counsel for Smith Corona requested production of the document, however, counsel for Pelikan stated "you're not going to get it." *Id.* at 1394. Pelikan asserted attorney/client privilege as justification for withholding the document. *Id.* at 1395.

At trial, the Court found it "astonishing," *id.* at 1396, that, although Mr. Polak claimed he had relied on a certain document as part of Pelikan's affirmative defense, Smith Corona was precluded from discovering that document. While counsel for Pelikan pointed out at trial that it subsequently had furnished a copy of the Donle memo "within days after this deposition was taken," *id.* at 1398, Smith Corona argued that this document was never properly identified as an opinion upon which Pelikan was relying, and that Smith Corona never had been entitled to proper discovery in regard to the genesis of the memo. *Id.* at 1403.

In excluding any testimony in regard to reliance on the Donle memo, the Court stated:

Well, I think you gentlemen have created problems for yourselves by this.... Seems to me that anybody that's got a law license and a client understands that the United States District Court—that the undertaking is to find out what the truth is and everything's geared to that and that the days of ambush and bushwacking [sic] and being clever and obstructionists, are gone. And the District Courts are simply not going to have any tolerance for that. If you're going to put up a claim of defense of counsel and there's a paper and an opinion, out with it.... And I don't understand why Ms. Kearney [sic] says you're not going to get it, and although it turns around and get it ... why would a lawyer say, You're not going to get it?

. . . .

I'm precluding that [Polak] can rely on that document from Donnolly [sic]. That's what these lawyers have not had a chance to explore; who Donnolly [sic] is, whether he is competent, what he knew to prepare it and be prepared to challenge the man about this opinion. From all we know he's an intern, a citizen of Germany, working in your law firm. How do they know the competence of the man? And we're bogged down now for 45 minutes on this question. It should have been solved at the deposition, Mr. Wettach.

*Id.* at 1404–05.

Finally, the Court addressed the issue of admissibility of the Donle memo itself. *See* trial transcript of February 25, 1991 (filed March 15, 1991; Docket Entry No. 225), pp. 1604–1619. While at that time counsel for Pelikan argued that the memo was offered, not for its truth, "but as to the predicate for Mr. Polak's reliance," *id.* at 1618, the Court excluded the memo because it was not listed as an exhibit on Pelikan's final exhibit list. Smith Corona, therefore, "had no idea [the memo] was going to be claimed

at trial as the defendant's exhibit and relied upon." *Id.* at 1619.[15]

Pelikan has cited no precedent to suggest that these rulings were contrary to law, and the Court finds that the exclusion of the Donle memo, and any evidence of reliance on it, was proper.

### 2. *Testimony of Mr. John Earley.*

■ Pelikan argues that the Court erred in excluding testimony in regard to an opinion from Mr. John Earley, Pelikan's outside patent attorney. The Court disagrees, as the record is clear that Mr. Earley's opinion was not excluded from evidence at trial.

Pelikan argues that "[a]lthough counsel for Pelikan attempted to explain that the contents of Mr. Earley's opinion had been brought into issue by Smith Corona's allegations of willfulness, the Court refused to permit Pelikan's witnesses to testify as to the contents of Mr. Earley's opinion." Pelikan's brief in support of JNOV motion, p. 73. However, the record is clear that Smith Corona did not object to Mr. Earley's testimony in regard to his opinion letter at trial. *See* trial transcript of February 21, 1991, p. 1379. Indeed, Mr. Earley was called by Pelikan and testified extensively on direct and cross examination about the contents of his written opinion in regard to the scope and validity of Smith Corona's '171 utility patent. *See* trial transcript of February 25, 1991, pp. 1790–1811. Thus, Pelikan's assertion is patently false.

In support of its argument, however, Pelikan points to the Court's exclusion from evidence of Mr. Polak's testimony in regard to the contents of the Earley opinion on the grounds of hearsay. *See* trial transcript of February 21, 1991, p. 1433. Yet, as reflected in a prior bench conference, the Court did *not* preclude Mr. Polak from testifying that he relied on Mr. Earley's opinion.

> THE COURT: [Mr. Wettach] can ask [Mr. Polak] what his understanding [of Mr. Earley's opinion] was. It's on that understanding that he based his reliance.

. . . .

> I understood the opinion on the advice of counsel is I can do this or that. Really it's a question of what he did do, if anything, on the advice of counsel after receiving it. What, if anything, did he do one way or the other with regard to possible infringements. That's not hearsay. That's the action he took. Predicate for it is he got the advice and relied upon it and then the other question is what course of action, if any, he took in reliance on it.

*Id.* at 1421–22. A cautionary instruction to the jury was thereafter given by the Court. *See id.* at 1423–24.

■ As a second basis for error, Pelikan points to Mr. Earley's testimony, in which the Court precluded the witness from discussing a conversation he had with Mr. Walter Duft, a representative of General Ribbon, Inc., another manufacturer of ink ribbon and correction cassettes. Reviewing his own opinion, Mr. Earley testified that claims 11–15 were not infringed by the Pelikan ribbon cassette. *See* trial testimony of February 25, 1991, pp. 1790–91. He was then questioned on the conversation with Mr. Duft in the following way:

> MR. WETTACH: Did you have a telephone conversation with anyone from General Ribbon concerning the '171 Patent?
>
> MR. EARLEY: Yes, I talked to Mr. Duft.
>
> MR. CHERRY: Same objection [as to hearsay].
>
> THE COURT: He just asked whether there was a conversation. He hasn't asked him to recite what the conversation was.
>
> MR. WETTACH: From your understanding with Mr. Duft, did you get an understanding of what General Ribbon's position was regarding the '171 Patent?
>
> MR. EARLEY: Yes, I did.
>
> MR. CHERRY: May we approach?
>
> . . . .

---

**15.** Indeed, at Mr. Earley's deposition, counsel for Pelikan informed counsel for Smith Corona that the Donle memo would *not* be introduced as evidence. *See* trial transcript of February 21, 1991, p. 1401.

THE COURT: Step up, gentlemen.

(Whereupon, following conversation had at bench.)

MR. CHERRY: Once again it's this telephone conversation with Mr. Duft, the attorney for General Ribbon. We object on the grounds that it's all hearsay, Your Honor. If they wanted General Ribbon's position or what Mr. Duft's opinion was, they could have deposed Mr. Duft and brought him here.

MR. WETTACH: Our position, Your Honor, is number one, the letter [from Mr. Earley to Mr. Polak regarding the conversation with Mr. Duft] is not hearsay. We are not offering it for the purpose of the contents thereof Secondly, what Mr. Earley's understanding is of their position is not hearsay. It's his understanding of what the position of General Ribbon was.

THE COURT: The problem that you have, even if [the letter is] not offered for the truth of the matter, it contains hearsay within hearsay. And hearsay within hearsay may be admissible if it conforms in every aspect to one of the exceptions under 803. And I don't know how you can get this hearsay within hearsay in without it conforming to the exception of 803.

MR. WETTACH: I haven't done anything with ... the letter so far. I just asked if he had written it.

THE COURT: You asked him if he wrote it and if he had a conversation, if he wrote it, if he sent it. And you're now coming around to what's his understanding. What's the real difference between his understanding and the content of what Mr. Duft said to him. It's essentially the same, Mr. Wettach.

*Id.* at 1792–94. The Court thereafter sustained Smith Corona's objection.

Upon review of the transcript, the Court finds that this decision was correct. Mr. Duft was not Pelikan's outside patent attorney and did not write an opinion letter or memorandum in regard to Smith Corona's '171 patent. Therefore, testimony as to Mr. Earley's recollection of Mr. Duft's opinion of the '171 patent constituted irrelevant and inadmissible hearsay.

**F. False Advertising.**

As its next basis for its motion for a new trial, Pelikan argues that the jury's finding of false advertising is against the clear weight of the evidence. The Court disagrees.

The Court notes that it instructed the jury as to the factors which must be proven to find a Lanham Act violation. *See* jury instructions, p. 64. Without reciting each and every evidentiary item offered at trial, the Court finds that the testimony of Mr. James McCormick, the Director of Supplies and Accessories Marketing for Smith Corona, and Dr. David Rados, Smith Corona's marketing expert, along with other evidence received, was sufficient to meet these factors and to support the jury's verdict. Accordingly, the Court rejects Pelikan's argument.

**G. Dilution Damages.**

Finally, Pelikan argues that the Court improperly permitted Smith Corona to introduce evidence of "dilution damages." No such evidence was admitted, and Pelikan's argument is without merit.

At trial, counsel for Pelikan objected to the introduction of so-called "dilution damages" because such damages are not permitted under the Lanham Act. *See* trial transcript of February 11, 1991, pp. 45–57 *and* trial transcript of March 4, 1991 (filed March 15, 1991; Docket Entry No. 229), pp. 2454–2479. At that time, counsel for Smith Corona correctly stated that "dilution" is a term of art in trademark law in which one company sues another, *noncompeting* company for reducing the value of its trademark, e.g., the Lexus automobile manufacturer suing the Lexis legal research company. *See* trial transcript of March 4, 1991, p. 2460. In this regard, dilution "is a creature of state statute" and not of the Lanham Act, which applies only to head-to-head competitors. *Id.* Counsel for Smith Corona maintained that it never sought dilution damages in this litigation, but that the term "trademark dilution" was inadvertently used by its damages expert, Mr. Aron Levko, a partner of Coopers and Lyb-

rand. *See* trial transcript of February 11, 1991, p. 46. Counsel for Smith Corona argued that Mr. Levko was actually referring to the reduction in value of Smith Corona's Right Ribbon System trademark as a result of Pelikan's false advertising. *See id.* at 46, 47, 49–52; *see also* trial transcript of March 1, 1991 (filed March 15, 1991; Docket Entry No. 228), pp. 2349–50. Indeed, argued Smith Corona, that is what Mr. Levko's damages calculation methodology shows. *See* trial transcript of March 4, 1991, pp. 2460–64, 2472–76.

 After hearing the arguments of counsel, the Court found that counsel for Pelikan was "taking a very artificial position" in regard to this aspect of Smith Corona's damages claim. *Id.* at 2476. While Mr. Levko may have inartfully used the term "dilution" in his deposition, it was clear from his calculations that he was figuring the loss of value in the Right Ribbon System trademark due to Pelikan's false advertising. Such damages are allowable under the Lanham Act. *See Broan Manufacturing Co. v. Associated Distributors, Inc.*, 923 F.2d 1232 (6th Cir. 1991); *see also Alpo Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958 (D.C.Cir. 1990). As the Court considered at trial, in order to calculate damage to a corporation's goodwill due to a competitor's false advertising, one must take into account the amount of money expended by the injured corporation in the promotion of its trademark. *See* trial transcript of March 4, 1991, p. 2477. Citing McCarthy, *Trademarks and Unfair Competition*, the Court observed that a business's trademark is "a symbol by which goodwill is advertised and buying habits established." Trial transcript of March 5, 1991 (filed March 15, 1991; Docket Entry No. 230), p. 2490. Accordingly, the Court finds that this evidence was properly submitted to the jury.

For the foregoing reasons, Pelikan's motion for a new trial should be denied.[16]

---

**16.** Having resolved this issue, Pelikan's motion for oral argument, *see* footnote 12, *supra*, is

## IV. MOTION TO CONTINUE STAY.

 As stated above, after the liability phase of the trial, the Court entered an order, permanently enjoining Pelikan from 1) making, using or selling the products which the jury found had infringed the three patents-in-issue; and 2) using certain phrases in connection with its advertising, packaging and promotion of its products which the jury found had violated the Lanham Act and the Tennessee Consumer Protection Act. Further, while the Court denied Pelikan's motion to stay the injunction, the Court granted Pelikan "five (5) working days from the date of entry of this order on the docket to file for such a stay, and this temporary stay shall remain in effect until the motion for a stay is ruled on by the Federal Circuit." Injunction order of the Court, p. 4.

Within this five-day period, Pelikan filed with the Federal Circuit a motion for stay pending appellate review under Rule 8, Fed.R.App.P.

On April 11, 1991, the Federal Circuit issued an order granting in part and denying in part Pelikan's motion for a stay. *See* exhibit B to Pelikan's motion to continue stay of injunction. In this order, the Federal Circuit denied Pelikan's motion to stay this Court's injunction which related to the Pelikan products found to infringe Smith Corona's design patents, and which related to Pelikan's deceptive advertising. *See id.* at 2–3. However, the Federal Circuit granted a stay of that portion of this Court's injunction which related to the Pelikan products found to infringe Smith Corona's '171 utility patent. There, the Court of Appeals stated that "the language of ... claims [11–15 of the '171 patent] does not necessarily support" the disputed jury instruction discussed in Part II, supra, of his memorandum. *Id.* at 3. In this regard, the Federal Circuit found that "Pelikan has raised substantial, serious and difficult questions going to the merits of the issue," *id.*, and granted the stay.

denied.

When Pelikan filed its motion for stay at the Federal Circuit, however, it did so without filing a Notice of Appeal.[17] Apparently, after discovering this fact, the Clerk of Court for the Federal Circuit "raised the issue as to the status and effect of the Federal Circuit's Stay Order...." Pelikan's memorandum in support of its motion to continue stay of injunction (filed May 29, 1991; Docket Entry No. 275), p. 2. Accordingly, Pelikan filed with the Federal Circuit a motion for expedited clarification, and continuance, of the stay. *See* exhibit C to Pelikan's motion to continue stay of injunction.

On May 21, 1991, in response to Pelikan's clarification motion, the Federal Circuit vacated its prior stay order due to lack of jurisdiction. *See* exhibit D to Pelikan's motion to continue stay of injunction. Pelikan now moves this Court to do that which the Federal Circuit could not, i.e., "stay ... that portion of the Interlocutory Injunction Order prohibiting Pelikan from making, selling or distributing Ribbon Cassette Product Nos. 758 and 761 or from otherwise infringing Claims 11–15 of the '171 patent." Pelikan's memorandum in support of its motion to continue stay of injunction, p. 6.

Smith Corona opposes Pelikan's motion, arguing in part that there is no stay in effect to "continue." *See* Smith Corona's opposition to Pelikan's motion to continue stay of injunction (filed June 7, 1991; Docket Entry No. 280), p. 1.

Technically, Smith Corona is correct. In accordance with the language of the Court's injunction order, the five-day temporary stay was to expire after "the motion for a stay is ruled on by the Federal Circuit." The Federal Circuit has done so; first, by granting the stay in part, and then by vacating the order and dismissing the case. Therefore, this Court's temporary stay is no longer in effect. Accordingly, due to the expiration of the temporary stay, the Court denies Pelikan's motion, as

the permanent injunction became effective on the date that the Federal Circuit vacated its prior order for lack of jurisdiction.[18]

## V. MOTION TO CLARIFY INJUNCTION.

■ Pelikan's motion to clarify the injunction issued by the Court essentially asks whether it may market products, purported by Pelikan to be modified and noninfringing, under the old product numbers cited in the Court's injunction order. The Court finds that Pelikan may.

As presently worded, the Court's injunction order prohibits Pelikan, *inter alia,* from the following:

1. making, using, or selling products covered by any one of Claims 11–15 of the '171 utility patent, including Pelikan Product Nos. 758 and 761, and from actively inducing others to commit such acts....;

2. making, using, or selling products covered by the '070 and '384 design patents, including Pelikan Product Nos. 759 and 762, and from actively inducing others to commit such acts....

Injunction order of the Court, pp. 3–4.

Pelikan asserts that "the above-quoted language is arguably susceptible of the interpretation that Pelikan is enjoined from making, using or selling *any* products under the designated Product Numbers, even if the products have been modified so that they do not infringe Smith Corona's patents." Pelikan's motion to clarify injunction order, p. 2. Pelikan, however, wishes to market ink ribbon and correction cassettes, which it claims have been modified so as to not infringe any of the three patents-in-issue, under these old product numbers. "Specifically, Pelikan desires to sell its modified print ribbon cassettes as Product Nos. 758 and 761 and its modified correcting cassettes as Product Nos. 759 and 762." *Id.* Pelikan argues that, if it is precluded from using these old numbers

---

**17.** Rule 8, Fed.R.App.P., pertains only to "[a]pplications for a stay of the judgment or order of a district court *pending appeal*...." (Emphasis added.)

**18.** Having resolved this issue, Pelikan's request for oral argument on this motion (filed May 29, 1991; Docket Entry No. 276), is denied.

for its new cassettes, "it would be necessary for Pelikan to replace its product catalogs, point-of-purchase product compatibility charts, and to take various other action to reduce the likelihood of confusion, all at substantial expense and risk of injury to Pelikan's business reputation and goodwill." *Id.* at 3.

Smith Corona opposes this motion. *See* Smith Corona's opposition to Pelikan's motion to clarify injunction order (filed April 11, 1991; Docket Entry No. 253). Smith Corona argues that Pelikan calls upon the Court to make an advisory opinion; that Pelikan's assertion that it has modified its cassettes is not supported by a sworn affidavit; that there is no way of knowing whether Pelikan's new cassettes actually avoid infringement; that "[i]n view of the fact that Pelikan has been adjudicated as having committed false and misleading advertising, and as being a willful infringer, it should be required to be especially careful in how it introduces new products." *Id.* at 1–6.

Smith Corona confuses the issue. As Pelikan correctly states, the Court is not called upon to determine whether Pelikan's new products actually avoid infringement of Smith Corona's patents or not. *See* Pelikan's reply to Smith Corona's opposition (filed April 24, 1991; Docket Entry No. 258), pp. 3–4. That is an issue for another lawsuit, should Smith Corona decide to pursue one, or for a motion for contempt should Smith Corona desire to file one. All that is asked of the Court is whether Pelikan is precluded from using the product number designations cited in the Court's injunction. The Court finds that it is not.

The order of the Court enjoins Pelikan from making, using, selling—or actively inducing others to make, use, or sell—products which infringe the three patents-in-issue. The Pelikan product numbers cited

in the order were referred to because they corresponded to certain Pelikan ink ribbon and correction cassettes found by the jury to infringe Smith Corona's patents, *not* to enjoin Pelikan from using those designations in and of themselves. Accordingly, the Court shall enter an appropriate order to that effect.[19]

## VI. INCREASED DAMAGES.[20]

At the close of the liability phase of this case, the jury returned damages in the following amounts:

$ 936,453.00 Lost profits for ribbon cassette sales as compensation for Pelikan's infringement of the '171 utility patent;

$ 151,601.00 Lost profits for Pelikan's sales of convoyed items which Smith Corona could have anticipated in connection with the '171 utility patent;

$ 542,933.00 Lost profits for correction cassette sales as compensation for Pelikan's infringement of the '070 and '384 design patents;

$ 41,000.00 Compensatory damages for false advertising under the Lanham Act; and an identical award for false advertising under the Tennessee Consumer Protection Act.[21]

$1,671,987.00 Total award.

*See* compensatory damages verdict (filed March 13, 1991; Docket Entry No. 275).

Because of the jury's finding that Pelikan willfully infringed Smith Corona's patents-in-issue, and willfully violated the Lanham Act and the Tennessee Consumer Protection Act, Smith Corona requests that the entire damage award be trebled to $5,015,-961.00.

### A. Willful Patent Infringement.

■ As stated above, the Court finds that there was sufficient evidence in the

19. Having resolved this issue, Smith Corona's motion for post-trial discovery regarding Pelikan's changed products and packaging (filed April 11, 1991; Docket Entry No. 254) is denied.

20. Because the Court resolves the issue of increased damages in this section, Pelikan's motion for oral argument, *see* footnote 12, *supra,* is denied.

21. Because Smith Corona's injury due to Pelikan's false advertising is identical under the Lanham Act and the Tennessee Consumer Protection Act, this figure may be counted only once.

record to sustain the finding of the jury on the issue of willful infringement. Upon a finding of willful infringement, "[t]he patent statute authorizes the court to 'increase the damages up to three times the amount found or assessed.'" *Avia Group International*, 853 F.2d at 1566 (quoting 35 U.S.C. § 284). However, while the award of treble damages is punitive in nature and designed "to deter willful patent infringement," *id.*, it is not mandatory. Rather, the decision to increase damages, and by what amount, is entirely within the discretion of the trial court, subject only to a clear showing of abuse of such discretion. *See Jurgens v. McKasy*, 927 F.2d 1552, 1562 (Fed.Cir.), *cert. denied,* ——— U.S. ———, 112 S.Ct. 281, 116 L.Ed.2d 232 (1991) and *Modine Manufacturing Company v. Allen Group, Inc.*, 917 F.2d 538, 543 (Fed. Cir.), *cert. denied,* ——— U.S. ———, 111 S.Ct. 2017, 114 L.Ed.2d 103 (1991). Further, "[i]n deciding whether to increase damages, the court must consider all of the circumstances of the case." *Jurgens*, 927 F.2d at 1562.

The Federal Circuit has provided some guidance with regard to the consideration of the totality of the case. In particular, a district court should consider: (1) whether an award of treble damages would "thwart efforts to challenge the validity of patents believed in good faith to be invalid," *Kloster Speedsteel AB v. Crucible, Inc.*, 793 F.2d 1565, 1581 (Fed.Cir.), *cert. denied*, 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987); (2) whether the issue of willfulness was "'sufficiently close on the evidence' that enhanced damages [are] not warranted," *Modine Manufacturing Company*, 917 F.2d at 543 (quoting the lower district court); and (3) whether an award of treble damages would further the purposes of punishment and deterrence, when considering the conduct of the willful infringer. *See Modine Manufacturing Co. v. Allen Group, Inc.*, 14 U.S.P.Q.2d (BNA) 1210, 1217, 1989 WL 205782 (N.D.Ca.1989), *aff'd*, 917 F.2d 538, 543 (Fed.Cir.1990); *see also Kloster Speedsteel*, 793 F.2d at 1581.

### 1. The Design Patents.

With regard to the '070 and '384 design patents, the Court finds that an award of treble damages is appropriate. Upon review of the evidence, the Court finds that Pelikan failed to exercise the requisite due care to avoid infringement of Smith Corona's patents. *See Studiengesellschaft Kohle, M.B.H. v. Dart Industries, Inc.*, 862 F.2d 1564, 1579 (1988). First, Pelikan offered no competent opinion of counsel tending to show that its correction cassettes did not infringe Smith Corona's designs, or that Smith Corona's design patents were primarily functional. "The duty of care normally requires the potential infringer to obtain competent legal advice of counsel before infringing or continuing to infringe." *Avia Group International*, 853 F.2d at 1566 (citations omitted). While failure to secure such an opinion does not require a finding of willfulness, it is one factor supporting such a finding. *See id.* With regard to the issue of increased damages,

> [a] party who has obtained advice of competent counsel, or otherwise acquired a basis for a *bona fide* belief that a patent is invalid, can be said to serve the patent system in challenging that patent in a law suit conducted fairly, honestly, and in good faith. Such a party should not have increased damages ... imposed solely because a court subsequently holds that belief unfounded....

*Kloster Speedsteel*, 793 F.2d at 1581 (emphasis in original). The contrary conclusion may be reached absent such an opinion, or other evidence of a bona fide belief of patent invalidity.

Pelikan argues that, because Smith Corona filed this lawsuit a mere eight days after serving Pelikan with notice that the '070 patent had issued, it had "the right to rely upon advice of its trial counsel in asserting a defense and in forming a good faith belief that the Design Patents were not infringed" by Pelikan's products. Pelikan's brief in opposition to Smith Corona's motion for increased damages (filed April 8, 1991; Docket Entry No. 251), p. 15. As discussed in Part III. E. 1.,

supra, this argument is meritless. Advice of trial counsel rendered in the preparation for trial is inadmissible evidence; it impermissibly places the credibility of the trial lawyer in issue. Also, the fact that this suit was filed eight days after the notice date does not excuse willful infringement. *See Power Lift, Inc. v. Lang Tools, Inc.*, 774 F.2d 478, 482 (Fed.Cir.1985) (jury finding of willful infringement upheld despite the fact that the lawsuit was filed nine days after the issuance of the patent); *see also Avia Group International*, 853 F.2d at 1566 (" '[t]he fact that [an infringer] may have started its infringement before the patents issued (or before [it was] aware of the patents) does not bar an award of increased damages....' ") (citation omitted).

Further, the Court cannot find that the issue of willful infringement in regard to the design patents was "close" enough to warrant denial of treble damages. Instead, the Court finds that the purposes of punishment and deterrence are well served by awarding treble damages here. Accordingly, the Court finds that the sum of $1,628,799.00 shall be assessed against Pelikan for the willful infringement of Smith Corona's design patents.

### 2. *The Utility Patent.*

■ The Court reaches a different conclusion with regard to the '171 utility patent. As stated above, the heart of this case is the proper construction of claims 11–15 of the '171 patent in light of *In re Stencel, supra*. This issue was hotly contested by both parties and their witnesses. While the Court accepted Smith Corona's interpretation of the case, and so instructed the jury, the Court finds that this issue was

sufficiently "close" to warrant denial of treble damages.[22] Here, as stated above, Pelikan offered the testimony of Mr. John Earley, its outside patent attorney. *See* trial transcript of February 25, 1991, pp. 1790–1811. On direct examination, Mr. Earley testified that claims 11–15 "are directed to a combination of elements including a means for assuring that the correction cassette was compatible with the ribbon cassette." *Id.* at 1791. Further, on recross examination, Mr. Earley testified that, while he had not known of the *Stencel* case by name when he wrote his opinion letter, *Stencel* "stands for the proposition advanced by Pelikan rather than for the proposition advanced by Smith Corona." *Id.* at 1811.

The Court finds that the interests of justice are not properly served by awarding treble damages in this situation. As the Federal Circuit stated in *Kloster Speedsteel*, the patent system profits when a party makes a good faith challenge to another's patent on the bona fide belief that the patent-in-issue is invalid. *See Kloster Speedsteel*, 793 F.2d at 1581. The Court finds that this is especially true when a party challenges, not only a patent, but a legal premise upon which that patent is to be construed. As Justice Harlan stated:

> [a] patent, in the last analysis, simply represents a legal conclusion reached by the Patent Office. Moreover, the legal conclusion is predicated on factors as to which reasonable men can differ widely. Yet the Patent Office is often obliged to reach its decision in an ex parte proceeding, without the aid of the arguments

22. One may fairly argue that it is somewhat incongruous to address the "closeness" of the proof of willfulness, when willful infringement must be proved by "clear and convincing evidence." However, the Federal Circuit has addressed this argument and found it to be without merit. *See Modine Manufacturing Company*, 917 F.2d at 543. In *Modine*, the Federal Circuit upheld the district court's denial of increased damages despite a finding of willful infringement by the jury. There, the Federal Circuit stated:

> [f]ar from ignoring the jury's verdict, [the district court] carefully considered the finding

of willful infringement in light of the deterrent function of enhanced damages in reaching [its] determination that enhanced damages were not appropriate to this particular case.

*Id.* Thus, while the issue of willful infringement is an issue of liability to be proved by clear and convincing evidence, the proper focus for a district court on the issue of increased damages is whether the goal of deterring future offenders is served or frustrated by such an award.

which could be advanced by parties interested in proving patent invalidity. *Lear, Inc. v. Adkins*, 395 U.S. 653, 670, 89 S.Ct. 1902, 1911, 23 L.Ed.2d 610, 622 (1969). Here, Pelikan's outside patent attorney opined on an alternative reading of the law as well as the non-infringing nature of Pelikan's product. In this situation, the Court finds that an award of treble damages would chill future efforts of other litigants "to challenge the validity of patents believed in good faith to be invalid." *Id.* For this reason, the Court denies Smith Corona's motion for treble damages for willful infringement of the '171 utility patent.

### B. False Advertising.

As stated above, the jury awarded $41,-000.00 in compensatory damages for false advertising independently under both the Lanham Act and the Tennessee Consumer Protection Act. Smith Corona argues that an award of treble damages is warranted under both statutes.

#### 1. *Lanham Act.*

 For violations of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), a district court may, in its discretion, award treble damages. Section 35 of the Lanham Act provides in part:

> In assessing damages, the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. *Such sum in either of the above circumstances shall constitute compensation and not a penalty.*

15 U.S.C. § 1117(a) (emphasis added).

While the Sixth Circuit has yet to apply this provision in the context of treble dam-

ages for violations of 15 U.S.C. § 1125(a), it has stated that an award of damages under the Lanham Act is at "the discretion of the judge subject only to the principles of equity...." *Wynn Oil Company v. American Way Service Corporation*, 943 F.2d 595, 606 (6th Cir.1991) (not yet paginated; text in WESTLAW). " 'The trial court's primary function is to make violations of the Lanham Act unprofitable to the infringing party.' " *Id.* at 606 (quoting *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 941 (7th Cir.1989), *cert. denied*, 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990)). *See also Metric & Multistandard Components Corporation v. Metric's, Inc.*, 635 F.2d 710, 715 (8th Cir.1980) ("the district court is given broad discretion to award the monetary relief necessary to serve the interests of justice....") (emphasis added).

Further, despite a pronouncement from the Sixth Circuit, the clear language of section 1117(a) prohibits this Court from granting an enhancement of the jury's award for punitive reasons.[23] *See Taco Cabana International, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1127 (5th Cir.1991); *Alpo Petfoods*, 913 F.2d at 970; and *Metric & Multistandard Components*, 635 F.2d at 715. Consequently, "if the district court decides to enhance damages under section 35(a) [of the Lanham Act], it should explain why the enhanced award is compensatory and not punitive." *Alpo Petfoods*, 913 F.2d at 970.

Smith Corona acknowledges that the non-punitive nature of the enhancement provision "complicates" the application of § 1117(a). *See* Smith Corona's brief in support of motion for increased damages and prejudgment interest (filed March 25, 1991; Docket Entry No. 243), p. 9. On this issue, the Fifth Circuit has stated that:

> [i]t is anomalous to say that an enhancement of damages, which implies an award exceeding the amount found "compensatory," must be "compensato-

**23.** In *Frisch's Restaurant, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 661 F.Supp. 971, 992 (S.D.Ohio 1987), the district court held that, under the Lanham Act, the "[p]laintiff is not entitled to recover punitive damages." *Id.* The Sixth Circuit affirmed this decision, without addressing the issue of punitive damages. *See Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Ohio*, 849 F.2d 1012 (6th Cir.1988).

ry" and not "punitive." Responding to that anomaly, we have suggested that enhancement could, consistent with the "principles of equity" promoted in section 35, provide proper redress to an otherwise undercompensated plaintiff where imprecise damage calculations fail to do justice, particularly where the imprecision results from defendant's conduct.

*Taco Cabana International,* 932 F.2d at 1127.

The Court agrees with this construction of section 1117(a). As reflected in the instructions to the jury, the Court recognized that calculations of damages for Lanham Act violations may contain an element of uncertainty. *See* compensatory damages instructions, p. 19. There, the Court instructed the jury that

> damages are not permitted which are remote or speculative in nature. This rule serves to preclude recovery, however, only were the *fact* of damage is uncertain, i.e., where the damage claimed is not the certain result of the wrong, and not where the *amount* of damage alone is uncertain. Thus, when assessing these damages, you may take into account the difficulty of proving an exact amount of damages from false or misleading advertising, as well as taking into account that Pelikan as the wrongdoer shall bear the risk of the uncertainty which its own wrong has created.

*Id.* at 19–20 (emphasis in original). The Court believes that enhancement of damages under section 1117(a) best serves the principles of equity "where imprecise damage calculations fail to do justice" and the movant can demonstrate that it has been undercompensated as a result.

While Smith Corona appears to share this view of section 1117(a),[24] it has not shown to the satisfaction of the Court that it has been undercompensated by the jury's award. To be sure, Smith Corona points out that the jury's award of $41,000.00 "is only about 6% of Mr. Levko's calculation of the $674,784 of damages caused by Peli-

kan's false advertising [and] is less than 2% of the $2,497,470 in advertising expenditures conservatively allocated to the Right Ribbon System feature and the correcting cassettes." Smith Corona's brief in support of motion for increased damages and prejudgment interest, p. 11. By itself, however, this recitation simply stands for the proposition that the jury did not give Smith Corona all that it wanted. It does not support Smith Corona's conclusion that it "must have lost far more that $41,000 in wasted advertising expenditures ... and the attendant loss of goodwill with consumers who have become frustrated with Smith Corona's Right Ribbon System feature," *id.*, as a result of Pelikan's Lanham Act violations. Therefore, in light of the liberal damages instruction quoted above, and the presumption that juries follow the instructions given them, the Court believes that an enhancement of the award in this instance would not serve the interests of justice. Accordingly, the Court denies Smith Corona's motion for increased damages on this issue.

2. *Tennessee Consumer Protection Act.*

█ Under the Tennessee Consumer Protection Act, treble damages may be awarded as follows:

> (3) If the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of this part, the court may award three (3) times the actual damages sustained and may provide such other relief as it considers necessary and proper.
>
> (4) In determining whether treble damages should be awarded, the trial court may consider, among other things:
>
> (A) The competence of the consumer or other person;
>
> (B) The nature of the deception or coercion practiced upon the consumer or other person;
>
> (C) The damage to the consumer or other person; and

---

**24.** *See* Smith Corona's brief in support of motion for increased damages and prejudgment interest, p. 11 ("[t]he Court should use its pow-

ers under Lanham Act § 35 to increase the damage award to more correctly compensate Smith Corona for its damages.")

(D) The good faith of the person found to have violated the provisions of this part.

Tenn.Code Ann. § 47–18–109(a)(3), (4). As with the Lanham Act, an award of treble damages rests with the discretion of the court. However, "[t]he Act is to be liberally construed to protect consumers and others from those who engage in deceptive act or practices." *Haverlah v. Memphis Aviation, Inc.*, 674 S.W.2d 297, 305 (Tenn.Ct. App.1984); *see also Akers v. Bonifasi*, 629 F.Supp. 1212, 1223 (M.D.Tenn.1984).

■ Smith Corona recognizes that, prior to 1989, only consumers could recover damages under this section. *See* Smith Corona's brief in support of motion for increased damages and prejudgment interest, p. 16 n. 6. Indeed, in 1987, the Sixth Circuit held that "the TCPA permits suits seeking damages to be brought only by consumers...." *Grantham and Mann, Inc. v. American Safety Products, Inc.*, 831 F.2d 596, 608 (6th Cir.1987); *see also id.* at 609 (citing *American Buildings Co. v. White*, 640 S.W.2d 569 (Tenn.Ct.App. 1982)). However, in 1989, the Tennessee legislature inserted the phrase "or other person" after the word "consumer" in § 47–18–109(a)(4)(A), (B), and (C) as stated above.[25] While Tenn.Code Ann. § 47–18–103(2) defines a "consumer" as "any natural person," § 47–18–103(7) defines "person" to include "partnership[s], corporation[s], trust[s], ... and any other legal or commercial entity however organized," in addition to "natural person[s]." Thus, because the Tennessee Consumer Protection Act affords a private right of action to "[a]ny person," Tenn.Code Ann. § 47–18–109(a)(1), and a trial court is required to consider specifically "[t]he damage to the consumer *or other person*," Tenn.Code Ann. § 47–18–109(a)(4)(C) (emphasis added), when considering the issue of treble damages, the Court finds that corporations may recover damages under the Act, and that *Grantham and Mann, Inc., supra*, is no longer good law.

■ In urging the Court to award treble damages under this law, Smith Corona argues that "[t]he Tennessee Consumer Protection Act permits the trebling of damages for purely punitive purposes." Smith Corona's reply brief to Pelikan's brief in opposition to increased damages (filed May 1, 1991; Docket Entry No. 262), p. 22. However, the Tennessee Court of Appeals has stated that punitive damages may *not* be awarded in an action under this law. *See Paty v. Herb Adcox Chevrolet Co.*, 756 S.W.2d 697, 699 (Tenn.Ct.App.1988).

We think that the legislature's restricting recovery to "actual damages" precludes the award of any other damages including punitive damages. As further evidence of the legislative intent to restrict recovery to "actual damages" as opposed to punitive damages is the provision that if the court finds the defendant's acts were "willful or knowing violation" of the statute, "the court may award three (3) times the actual damages sustained."

*Id.*

This statement of the law is somewhat ambiguous, i.e., while punitive damages are precluded, treble damages for "willful or knowing" violations are permissible. However, in an earlier, unreported decision, the Tennessee Court of Appeals clarified this matter.

Treble damages are not awarded for every violation of the Tennessee Consumer Protection Act of 1977. Unlike other treble damages statutes, Tenn.Code Ann. § 47–18–109(a)(3) provides that actual damages will be trebled only when the defendant's conduct is a "willful or knowing violation" of the Act and then only after the trial court has considered the factors enumerated in Tenn.Code Ann. § 47–18–109(a)(4)....

The Tennessee Consumer Protection Act of 1977 permits treble damage awards in lieu of awards of punitive damages. *Like punitive damages, treble damages are not intended to compensate an injured plaintiff but rather to*

**25.** *See* legislative note to the 1989 supplement to § 47–18–109 ("[t]he 1989 amendment added 'or other person' after 'consumer' throughout the section.")

*punish the defendant and to deter similar conduct in the future.*
*Spence v. Moody,* 1987 WESTLAW 20039 (Tenn.Ct.App.1987) (unreported; text in WESTLAW; emphasis added).[26] Thus, Smith Corona's assertion is correct.

█ Turning to the application of the Tenn.Code Ann. § 47–18–109(a)(3), the jury found that Pelikan had willfully violated the Tennessee statute. The jury returned this verdict after being instructed as follows: "[i]f you find that Pelikan has violated ... the Tennessee Consumer Protection Act, you must decide if Pelikan's conduct was willful. An act is willfully done if done voluntarily and intentionally and with the specific intent to commit such an act." Jury instruction, p. 68. Under Tennessee law, " ' "[k]nowingly" or "knowing" means actual awareness of the falsity or deception...." ' " *Haverlah,* 674 S.W.2d at 305 (quoting Tenn.Code Ann. § 47–18–103(e)). Clearly, the jury's verdict satisfies § 47–18–109(a)(3) and "[t]he evidence in the record does not preponderate against [this] finding[ ]...." *Brandel v. Moore Mortgage and Investment Company,* 774 S.W.2d 600, 607 (Tenn.Ct.App.1989).

In considering the criteria specified in § 47–18–109(a)(4), the Court refers to the jury's responses to the Court's interrogatories. In its verdict, the jury found that Pelikan's advertising (1) contained "false statement[s] of fact"; (2) contained "misleading statement[s] of fact"; (3) had "a tendency to deceive customers"; and (4) was "likely to influence purchasing decisions." *See* verdict of the jury, p. 9. Further, the jury found that Smith Corona had shown actual injury due to Pelikan's advertising. *Id.* at 9–10. Finally, the record supports the conclusion that Pelikan did not act in good faith.

The Court finds, in light of the liberal construction to be afforded this statute, that the enhancement of damages in this case would serve the purposes of punishment and deterrence articulated in *Spence* and would "protect legitimate business-enterprises from those who engage in unfair or deceptive acts or practices in the conduct of trade or commerce in part or wholly within Tennessee...." *Akers,* 629 F.Supp. at 1223. As a result of Pelikan's deceptive advertising, the injury to Smith Corona's goodwill and to its trademark "Right Ribbon System" was acute. Accordingly, Smith Corona's damage award of $41,000.00 shall be trebled to $123,000.00.

## VII. PREJUDGMENT INTEREST.

Pursuant to 35 U.S.C. § 284, Smith Corona also seeks prejudgment interest on the jury award of lost profits due to Pelikan's patent infringement.

█ While an award of prejudgment interest is within the discretion of the court, *see General Motors Corporation v. Devex Corporation,* 461 U.S. 648, 656–57, 103 S.Ct. 2058, 2063, 76 L.Ed.2d 211, 218 (1983), prejudgment interest in patent infringement cases "should be awarded under § 284 absent some justification for withholding such an award." *Id.* 461 U.S. at 657, 103 S.Ct. at 2063, 76 L.Ed.2d at 218. Further, prejudgment interest is compensatory and "is necessary to ensure that the patent owner is placed in as good a position as he would have been [but for the infringement]." *Id.* 461 U.S. at 655, 103 S.Ct. at 2062, 76 L.Ed.2d at 217.[27] Thus, a patent owner generally is entitled to recover for "the forgone use of the money [it would have received, absent infringement] between the time of infringement and the

---

26. The Court recognizes that, as in the federal judicial system, the citation of unpublished, intermediate decisions is disfavored in the State of Tennessee. However, the Supreme Court of Tennessee has acknowledged that an unpublished decision may present a better-reasoned analysis of a particular issue than published opinions. *See Isbell v. Isbell,* 816 S.W.2d 735 (Tenn.1991). Because the Court cannot improve upon the analysis set forth in *Spence,* the Court utilizes the *Spence* holding here.

27. The fact that *General Motors* involved prejudgment interest on lost reasonable royalties, while this case involves prejudgment interest on lost profits, does not justify a different result in this case. *See Gyromat Corp. v. Champion Spark Plug Company,* 735 F.2d 549, 556 (Fed. Cir.1984) (applying *General Motors* in addressing prejudgment interest for lost profits).

date of judgment." *Id.* 461 U.S. at 656, 103 S.Ct. at 2063, 76 L.Ed.2d at 218. Finally, in fixing the interest rate for prejudgment interest, the Court has " 'substantial discretion.' " *Datascope Corp. v. SMEC, Inc.,* 879 F.2d 820, 829 (Fed.Cir.), *cert. denied,* 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 747 (1990) (quoting *Gyromat Corp. v. Champion Spark Plug Company,* 735 F.2d 549, 556 (Fed.Cir.1984)); *see also Studiengesellschaft Kohle,* 862 F.2d at 1580.

■ To assist the Court on this issue, Smith Corona has submitted an affidavit of its damages expert, Mr. Aron Levko (filed March 25, 1991; Docket Entry No. 244). In this affidavit, Mr. Levko states that, in calculating prejudgment interest, he utilized an interest rate of 9.25 percent, which he declares was "the average interest rate incurred by Smith Corona for outstanding debt during fiscal year 1990." Affidavit of Aron Levko, p. 2. Mr. Levko asserts that this interest rate is "conservative" and "was taken from Smith Corona's Form 10–K Report filed with the Securities and Exchange Commission for the fiscal year ended June 30, 1990." *Id.* Referring to exhibits attached to his affidavit, Mr. Levko further asserts that the prime rate for the 1990 fiscal year and the 1990 calendar year exceeded his selected rate of 9.25 percent. *Id.*

Pelikan objects to the use of the rate of 9.25 percent, arguing that "case law indicates that the appropriate rate for prejudgment interest is the coupon issue yield equivalent of the average 52 week Treasury Bill rate," and that "[t]o award an interest rate higher than the statutory rate, Smith Corona is required to affirmatively demonstrate that a higher rate should be used." Pelikan's memorandum in opposition to Smith Corona's motion for prejudgment interest (filed April 8, 1991; Docket Entry No. 250), p. 3. Pelikan's assertions are without merit.

■ Contrary to Pelikan's assertion, the Federal Circuit has declined to establish any rule regarding the proper interest rate to be utilized for the calculation of prejudgment interest. *See Studiengesellschaft Kohle,* 862 F.2d at 1580. Pelikan points to the decision of *Datascope, supra,* as support for its argument that the Court should use the Treasury Bill rate for this calculation. However, as stated above, the Federal Circuit in *Datascope* stated that the district court has "substantial discretion" on this issue, *Datascope,* 879 F.2d at 829, and that the lower district court did not abuse its discretion by applying the Treasury Bill rate. *See id.* This is a far cry from an endorsement of the Treasury Bill rate as "the appropriate rate for prejudgment interest."

■ Secondly, Pelikan cites *Lam, Inc. v. Johns–Manville Corporation,* 718 F.2d 1056 (Fed.Cir.1983), and other district court precedent relying on *Lam,* to support its proposition that Smith Corona has an affirmative obligation to demonstrate the necessity of using an interest rate higher than the Treasury Bill rate. While the language of *Lam* may lead to that conclusion, *see Lam,* 718 F.2d at 1066, Pelikan's argument has been specifically repudiated by a later Federal Circuit decision. *See Studiengesellschaft Kohle,* 862 F.2d at 1579 ("We reject [the defendant's] argument because our considered view of *Lam* is that it did not establish any 'rule' requiring what [the defendant] calls an 'affirmative demonstration' [of the necessity of a higher interest rate].")

Therefore, after considering the law on this issue, the arguments of the parties, and the affidavit of Mr. Levko, the Court finds that Mr. Levko's calculations are reasonable and adequately compensate Smith Corona for its lost opportunity costs, i.e., the forgone use of its lost profits. Accordingly, the Court adopts Mr. Levko's calculations and awards Smith Corona the additional sum of $65,561.00 as prejudgment interest compensation.[28]

## VIII. INTERIM DAMAGES.

■ Finally, Smith Corona moves for additional "interim" damages as compensa-

---

**28.** Having resolved this issue, Pelikan's motion for oral argument, *see* footnote 12, *supra,* is denied.

tion for any injuries it may have sustained between the date of the jury verdict (March 13, 1991) and the effective date of the permanent injunction. As stated above, the permanent injunction issued by the Court became effective on the date that the Federal Circuit vacated its prior order due to lack of jurisdiction. However, the Court finds that Smith Corona's motion is not well-taken and should be denied. Smith Corona's proper avenue for redress is not through a motion for interim damages, but via a motion for contempt if it finds that Pelikan has violated this injunction. Accordingly, Smith Corona's motion for interim damages, and its motion for post-trial discovery on this issue (filed March 25, 1991; Docket Entry No. 239), are denied.[29]

### IX. CONCLUSION.

For the reasons set forth above, the Court finds as follows:

(1) Pelikan's motion for judgment notwithstanding the verdict or, in the alternative, a new trial is denied;

(2) Smith Corona's motion for increased damages and prejudgment interest is granted in part and denied in part;

(3) Smith Corona's motion for interim damages is denied;

(4) Smith Corona's motion for post-trial discovery regarding damages is denied;

(5) Smith Corona's motion for post-trial discovery regarding Pelikan's changed products and packaging is denied;

(6) Pelikan's motion to clarify injunction is granted;

(7) Pelikan's motion to continue stay of injunction is denied;

(8) Pelikan's request for oral argument on the issues of JNOV, new trial, interim damages, and increased damages is denied;

(9) Pelikan's request for oral argument on its motion to continue stay of injunction is denied; and

(10) Smith Corona's motion to strike Pelikan's motion for JNOV/new trial is denied.

denied.

---

**29.** Having resolved this issue, Pelikan's motion for oral argument, *see* footnote 12, *supra,* is